# IN THE SUPREME COURT OF TEXAS

No. 09-0306

BETTY YVON LESLEY, ET AL., PETITIONERS,

v.

VETERANS LAND BOARD
OF THE STATE OF TEXAS, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE ELEVENTH DISTRICT OF TEXAS

**Argued September 15, 2010**

JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE WAINWRIGHT, JUSTICE MEDINA, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, and JUSTICE LEHRMANN joined.

CHIEF JUSTICE JEFFERSON did not participate in the decision.

The right to lease minerals — the executive right — is one "stick" in the bundle of five real property rights that comprise a mineral estate.[1] We held long ago that the executive owes other owners of the mineral interest a duty of "utmost fair dealing",[2] but we have seldom had occasion to

---

[1] *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) ("There are five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, (5) the right to receive royalty payments." (citation omitted)), cited in *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995) ; *see also Day & Co., Inc. v. Texland Petroleum, Inc.* 786 S.W.2d 667, 669 (Tex. 1990) ("[T]he executive right is an interest in property, an incident and part of the mineral estate like the other attributes such as bonus, royalty and delay rentals.").

[2] *Schlittler v. Smith*, 101 S.W.2d 543, 545 (Tex. 1937).

elaborate. In this case, a land developer, who also owned part of the mineral estate and all of the executive right, imposed restrictive covenants on a subdivision, limiting oil and gas development in order to protect lot owners from intrusive exploratory, drilling, and production activities. The non-participating mineral interest owners complain that the developer, as the executive, breached its duty to them. The court of appeals held that the developer, never having undertaken to lease the minerals, had not exercised the executive right and therefore owed no duty to the other mineral interest owners.[3] We disagree, and accordingly, reverse and remand the case to the trial court.

## I

In 1998, Bluegreen Southwest One, L.P. acquired about 4,100 acres of land southwest of Fort Worth, which Betty Yvon Lesley and others (collectively, "Lesley")[4] had conveyed to its predecessor.[5] Lesley's deeds[6] reserved part of her undivided half interest in the minerals. The other half is owned by the successors of Wyatt and Mildred Hedrick (collectively, "Hedrick"),[7] the couple who once owned all the property. Bluegreen also acquired from Lesley the executive right in the entire 4,100-acre mineral estate — that is, in the words of Hedrick's original deed, the "full,

---

[3] 281 S.W.3d 602 (Tex. App.–Eastland 2009).

[4] The others were Lesley's husband, Kenneth, and her brother, Bobby John Foster. Foster died shortly before this suit was filed. The Lesleys and the independent executors of Foster's estate are petitioners here.

[5] At the time Bluegreen acquired the property, its name was Properties of the Southwest, L.P. Its predecessor was Bluff Dale Development Corporation.

[6] There were two deeds conveying the property in two separate tracts, both containing the same reservation. Our description of the conveyances that have led to the present controversy is greatly simplified so as not to distract from the issues before us. More detail is provided in the court of appeals' opinion. *See* 281 S.W.2d at 608-610.

[7] The successors, also petitioners here, are Richard H. Coffey, Sr., Singin' Hills Minerals, Ltd., and JP Morgan Chase Bank, N.A., as trustee of several trusts.

complete and sole right to execute oil, gas and mineral leases covering all the oil, gas and other minerals in the following described land".

Bluegreen developed the property into "Mountain Lakes," a subdivision of over 1,200 lots, adding restrictive covenants to "enhance[] and protect[] the value, desirability and attractiveness" of the subdivision. These included a provision forbidding "commercial oil drilling, oil development operations, oil refining, quarrying or mining operation". The covenants provide that they can be modified or abrogated "by the written agreement or signed ballot of two-thirds . . . of the Owners (including the Developer) entitled to vote." Bluegreen's deeds conveying the lots to some 1,700 owners included the mineral interest, excepting only the restrictive covenants and the mineral interests previously reserved to Hedrick and Lesley. The deeds did not mention the executive right.

While Mountain Lakes was being developed, so was the Barnett Shale, a hydrocarbon-producing geological formation underlying this part of North Texas and possibly this subdivision. Almost all the surrounding area came under lease for oil and gas production. There is evidence that Mountain Lakes is sitting on $610 million worth of minerals that, in large part, cannot be reached from outside the subdivision.

In 2005, Hedrick and Lesley sued Bluegreen and the Mountain Lakes lot owners, one of whom is the Texas Veterans Land Board,[8] complaining under various theories of the restrictive covenants limiting mineral development. On the parties' multiple motions for summary judgment

---

[8] Plaintiffs also sued the Property Owners' Association of Mountain Lakes Ranch. The trial court granted summary judgment in its favor. It is not a party on appeal.

3

and the VLB's plea to the jurisdiction, the trial court issued an order making declarations which we

organize and summarize as follows:

- **Conveyances:**

  - Lesley's deeds should be reformed to reserve a one-fourth mineral interest in the entire 4,100-acre tract as the parties undisputedly intended, rather than only one-fourth of Lesley's one-half interest (one-eighth of the entire minerals) as stated in the deeds. Reformation will not affect the reasonable expectations of the lot owners, who will receive all they bargained for.

  - Bluegreen's deeds to the lot owners did not convey the executive right, and it remains the sole and exclusive owner of the executive right.

- **The executive right:**

  - Bluegreen, as owner of the executive right, breached its duty to Hedrick and Lesley by imposing restrictive covenants limiting oil and gas development and by failing to lease the minerals. Bluegreen also breached a requirement in the Lesley deeds by failing to give notice of its filing of the restrictive covenants. For these reasons, the covenants are unenforceable.

  - Irrespective of the executive right, Hedrick and Lesley have the right to develop their mineral interests themselves.

- **Immunity:** The VLB is not immune from Hedrick and Lesley's suit.

The trial court severed its order from other claims in the case to make it final and appealable.

Bluegreen and some, but not all, of the individual lot owners (about 460 altogether), including the

VLB, appealed.[9]

The court of appeals reversed the trial court's order in its entirety. Specifically, it held:

- **Conveyances:**

---

[9] 281 S.W.3d at 608.

4

- The Lesley deeds were so clear, Lesley should have known of the asserted mistake when she executed them, and because she did not sue within four years, her claim for reformation is barred by limitations.[10]

- Bluegreen's deeds to the lot owners did not expressly reserve the executive right, and it could not be excepted by implication with the restrictive covenant, so it passed to the lot owners.[11]

- **The executive right:**

  - The owner of an executive right owes a mineral interest owner no duty until the right is exercised by leasing the minerals, and then its duty is only to acquire for the mineral interest owner every benefit it acquires for itself. An executive has no duty to lease minerals. Because Bluegreen never exercised the executive right, it had no duty to Hedrick and Lesley.[12] Bluegreen was not bound by the notice requirement in the Lesley deeds because Bluegreen was not in privity with Lesley and the requirement did not run with the land.[13]

  - Hedrick and Lesley's right to develop their minerals passed to Bluegreen with the executive right, leaving them no right to develop their minerals themselves.[14]

- **Immunity:** The VLB is immune from Hedrick and Lesley's suit.[15]

The court of appeals remanded the case for further proceedings.[16]

---

[10] *Id*. at 623-625.

[11] *Id*. at 616-617.

[12] *Id*. at 618-619.

[13] *Id*. at 621-622.

[14] *Id*. at 620.

[15] *Id*. at 625-629.

[16] *Id*. at 629.

5

We granted the petitions for review of Bluegreen, the lot owners, and the VLB.[17] We begin with the issue of the VLB's immunity, because it is jurisdictional, and then turn to the deed construction issues, before coming finally to the issues concerning the executive right. We refer to Hedrick and Lesley collectively as petitioners.

## II

The Veterans Land Board was created by the Texas Constitution to administer programs providing assistance to veterans, including the purchase of land for sale to veterans.[18] Petitioners sued the VLB as the owner of lots in the Mountain Lakes subdivision.

As a state agency,[19] the VLB generally has immunity from certain suits to which the Legislature has not consented.[20] Petitioners acknowledge that they sued the VLB and other lot owners for damages, but only for breaching the executive right in the minerals. Petitioners contend that because they also sought and obtained a declaration that Bluegreen owned the executive right, their damage claims against the lot owners no longer have merit and should therefore be irrelevant

---

[17] 53 Tex. Sup. Ct. J. 911 (July 2, 2010).

[18] TEX. CONST. art. III, § 49-b(g)-(h); *see also* TEX. NAT. RES. CODE §§ 161.001-.515, 162.001-.019, & 164.001-.019.

[19] *Id.* § 161.011 ("The Veterans Land Board is a state agency designated to perform the governmental functions authorized in Article III, Section 49-b of the Texas Constitution.").

[20] *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex. 1997) ("This Court has long recognized that sovereign immunity, unless waived, protects the State of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the State."); *State v. Lain*, 349 S.W.2d 579, 582 (Tex. 1961) ("When in this state the sovereign is made a party defendant to a suit for land, without legislative consent, its plea to the jurisdiction of the court based on sovereign immunity should be sustained in limine."); *but see* TEX. NAT. RES. CODE §164.019 ("A writ of mandamus and all other legal and equitable remedies are available to a party in interest to require the board and any other party to carry out agreements and to perform functions and duties under this chapter, the Texas Constitution, or the board's bond resolutions or orders.").

in determining VLB's immunity.  Petitioners argue that by asserting Bluegreen's ownership of the executive right, they asserted the VLB's *non*-liability for breach of that right: "the declaratory judgment ultimately sought and obtained", petitioners insist, "is the opposite of attempting to impose liability".[21]

Petitioners' argument amounts to this: a suit against a state agency for a declaration that it does not own an interest in property is barred only if the agency prevails on the merits of the claim. If it turns out, after a full hearing, that the plaintiff is correct and the agency does not own the interest, the suit is not barred.  The agency is not entitled to dismissal unless it wins on the merits. This is not immunity from suit; it is immunity from victory.

Petitioners also argue that the VLB should not be immune from their suit because they do not seek the executive right for themselves.  But petitioners do seek to establish that the VLB and other lot owners do not have the executive right,[22] that restrictive covenants imposed for the lot owners' benefit are unenforceable, and that petitioners have a right to develop their own mineral interests irrespective of the executive right.  By each of these claims, petitioners have sued to determine the VLB's real property interests.  This is clearly a "suit for land" from which the VLB is immune.[23]

---

[21] Petitioners' Brief on the Merits 41; *see also* Petitioners' Reply Brief to Veterans Land Board 8 (citing *Tex. Parks & Wildlife Dept. v. Sawyer Trust*, No. 07-06-0487-CV, 2007 Tex. App. LEXIS 8165, 2007 WL 2390434 (Tex. App.–Amarillo, August 22, 2007, pet. granted).

[22] The VLB has asserted only its immunity from suit and has not taken a position on the merits of petitioners' claims.

[23] *See Lain*, 349 S.W.2d at 582.  Petitioners do not argue that they could maintain their suit against the VLB's officers or that they have some other action not barred by immunity, and therefore we do not address these issues.

# III

Next, we consider the conveyance issues regarding the mineral interest reserved by the Lesley deeds and whether the executive right was conveyed by Bluegreen's deeds to the lot owners.

## A

When Lesley conveyed the 4,100-acre tract to Bluegreen's predecessor, she owned an undivided half interest in the minerals, the other half having been previously reserved to Hedrick. Besides reserving the Hedrick interest, the Lesley deeds contained the following provision:

> **Grantors will be reserving** unto themselves, their heirs and assigns, **one-fourth (1/4) of the** oil, gas, sulphur and other **minerals to which Grantors are now entitled to in all of the lands covered by this conveyance. It is understood and agreed, however, that Grantee**, his heirs, successors and assigns, shall have full rights to execute all future oil, gas, sulphur and other mineral leases for such bonuses, such delay rentals and for such terms as Buyers may think proper, but Grantors shall not be required to execute any such leases, but **shall be entitled to receive one-fourth (1/4) of all bonuses and delay rentals**, whether the same be paid in cash, by overriding royalties, production payments or in any other manner.

(Emphasis added.) Lesley concedes that since she owned one-half of the minerals in the 4,100 acres "covered by [the] conveyance", the reservation of one-fourth of the "minerals to which [she was] entitled" amounted to only one-eighth of the entire mineral estate. But she argues that this misstated the parties' agreement, as shown by the inconsistent reservation of "one-fourth (1/4) of *all* bonuses and delay rentals" (emphasis added), not just one-eighth. And she points out that Bluegreen itself appears to have shared her understanding, reserving in many of its own deeds to lot owners the

8

"undivided one-fourth of *all* . . . minerals . . . reserved by [the Lesley deed]" (emphasis added). Lesley contends that the deeds should be reformed because of mutual mistake.[24]

In *Brown v. Havard*, we held that "a suit for reformation of a deed is governed by the four year statute of limitations" which runs from the date "the mistake was or, in the exercise of reasonable diligence, should have been discovered."[25] Lesley contends that she did not realize the mistake until long after the date the deeds were executed and within four years of bringing suit. Relying on *Brown*, the court of appeals rejected her argument, concluding that the alleged mistakes in the deeds were so plain "'as to charge [Lesley] with the legal effect of the words used.'"[26]

But in *Brown*, we held that the deed language at issue was *not* so plain as to call a later-asserted mistake to the grantees' attention. The Browns had deeded property to the Kings, reserving "an undivided one-half non-participating royalty (Being equal to, not less than an undivided 1/16th) of all the oil, gas and other minerals, in, to and under or that may be produced from said land".[27] The Kings had conveyed the property to Havard and others (collectively, Havard), who leased the property for a three-eighths royalty, except for acreage including a shut-in well that they then developed themselves.[28] The Browns claimed one-half of the production from Havard's well and

---

[24] Lesley does not contend for a favorable construction of the reservation according to its terms, taking into account the inconsistency she asserts. *Cf. Concord Oil Co. v. Pennzoil Exploration and Prod. Co.*, 966 S.W.2d 451, 457-458 (Tex. 1998) (plurality op.) (construing a deed with inconsistent fractions by determining the parties' intent from the terms).

[25] 593 S.W.2d 939, 943-944 (Tex. 1980) (citing *Miles v. Martin*, 321 S.W.2d 62 (Tex. 1959)).

[26] 281 S.W.3d 602, 625 (Tex. App.–Eastland 2009) (quoting *Brown v. Havard* 593 S.W.2d at 944).

[27] *Brown*, 593 S.W.2d at 940 (emphasis omitted).

[28] *Id.* at 940-941.

9

one-half of Havard's three-eighths royalty from the lease.[29]  Havard sued for reformation, contending that the Browns' agreement was for a one-sixteenth royalty.[30]  The jury returned a verdict supporting Havard's claim for reformation, but the trial court held that the claim was barred by limitations as a matter of law because the Kings were charged with knowledge of the deed's language.[31]  We disagreed, holding that when the Kings should have realized the mistake Havard asserted was a factual issue because any "mistake [was not] so plainly evident as to charge King with the legal effect of the words used."[32]

The reservation in the Lesley deeds may not be as opaque as the one in *Brown*, but its reservation of one-fourth the delay and bonus payments is twice the amount to which a one-eighth mineral interest would be entitled.  "Commentators have . . . observed that most grantors do not intend to convey interests of different magnitudes", but "[w]e cannot say categorically that no conveyance with differing fractions" does so.[33]  Still, Bluegreen itself, in repeating the reservation in its own deeds to the lot owners, appears to have shared Lesley's understanding that she had reserved one-fourth of the entire minerals.  In these circumstances, it cannot be said that, as a matter

---

[29] *Id*. at 941.

[30] *Id*.

[31] *Id*.

[32] *Id*. at 944.

[33] *Concord Oil Co. v. Pennzoil Exploration and Prod. Co.*, 966 S.W.2d 451, 460 (Tex. 1998).

10

of law, Lesley knew or should have known of the mistake in her deed when she executed it. Whether her claim for reformation is barred by limitations involves disputed facts.[34]

**B**

The parties agree that Bluegreen owned the executive right in the 4,100-acre mineral estate when it implemented the restrictive covenants for the subdivision, but they dispute whether the right was included in Bluegreen's deeds to the lot owners. Each deed to a lot conveyed the land and Bluegreen's mineral interest, excepting Hedrick's and Lesley's interests, without mentioning the executive right.

Very similar circumstances were presented in *Day & Co., Inc. v. Texland Petroleum, Inc.* There, Keaton and Young deeded an 80-acre tract to Day, Inc., reserving an undivided one-half interest in the minerals, but expressly conveying the entire executive right.[35] Day, Inc., in turn, deeded ten acres to the Shoafs, reserving an undivided one-fourth interest in the minerals and making no mention of the executive right.[36] We held that the one-fourth mineral interest conveyed by Day to the Shoafs and the one-fourth mineral interest reserved to Day were each accompanied by the executive right covering that interest, explaining:

> When an undivided mineral interest is conveyed, reserved or excepted, it is presumed that all attributes remain with the mineral interest unless a contrary intention is expressed. Therefore, when a mineral interest is reserved or excepted in a deed, the executive right covering that interest is also retained unless specifically conveyed.

---

[34] Bluegreen and the lot owners have not challenged the trial court's declaration that reformation will not deprive them of their bargain, and we express no view of the matter.

[35] 786 S.W.2d 667, 668 (Tex. 1990).

[36] *Id.*

11

Likewise, when a mineral interest is conveyed, the executive right incident to that interest passes to the grantee unless specifically reserved.[37]

But the executive right, expressly conveyed to Day, covering the one-half mineral interest reserved by Keaton and Young, passed from Day to the Shoafs because it was not reserved or excepted in Day, Inc.'s deed to them.[38]

By the rules of *Day & Co.*, Bluegreen's deed to each lot conveyed the executive right covering both the lot owner's mineral interest and Hedrick's and Lesley's mineral interests, unless the right was reserved or excepted. Hedrick and Lesley argue that an exception in each deed for the restrictive covenant limiting development of the minerals effectively reserved the executive right to Bluegreen because the covenant prohibited the lot owners from developing the minerals, and thus from leasing them. But the argument overlooks the provision of the covenant allowing modification or abrogation by a two-thirds vote of the owners. The exception did not withdraw the executive right from the conveyances in the lot owners' deeds but merely subjected the exercise of the right to the covenant's limitations.[39] Thus restricted, the right was conveyed by each lot owner's deed.

## IV

We come now to the principal issues in the case: the nature of the duty that the owner of the executive right owes to the non-executive interest owner, and whether that duty has been breached.

---

[37] *Id*. at 669 n.1 (citations omitted).

[38] *Id*. at 669.

[39] The parties have argued here only that the executive right in Hedrick's and Lesley's minerals is owned either by Bluegreen or by the lot owners. The parties have not addressed the effect of the conveyances of the right covering Hedrick's and Lesley's minerals to multiple lot owners.

12

"The executive right is the right to make decisions affecting the exploration and development of the mineral estate", but it is "most commonly exercised . . . by executing oil and gas leases".[40] Executive rights are frequently severed from other incidents of mineral ownership,[41] as they were from the mineral interests reserved to Hedrick and Leslie. The non-executive mineral interest owner owns the minerals in place but does not have the right to lease them. The non-executive royalty interest owner owns an interest in the royalty when the executive leases the minerals.[42] Non-executive interests may be perpetual or only for a term.[43] They are created for many different reasons, among them the simple convenience of reserving the power to make leasing decisions in one person. And because executive and non-executive interests are real rather than personal, they survive the parties who created them and persist long after circumstances have changed. The Hedricks conveyed the executive right to their reserved one-half interest in their 4,100 acres decades before anyone contemplated developing a residential subdivision on the property or producing natural gas from the Barnett Shale beneath it.

For most mineral interest owners, revenue comes through leasing. If the exclusive right to lease the minerals could be exercised arbitrarily or to the non-executive's detriment, the executive power could destroy all value in the non-executive interest, appropriating its benefits for himself or

---

[40] Ernest E. Smith, *Implications of a Fiduciary Standard of Conduct for the Holder of the Executive Right*, 64 TEX. L. REV. 371, 372 (1985).

[41] *Id.*

[42] *See generally* 2 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW § 338 (1985) (the executive power to make leases remains with an owner of the mineral estate, generally speaking, after the owner grants a royalty interest).

[43] Smith, 64 TEX. L. REV. at 380-381.

others.  The law has never left non-executive interest owners wholly at the mercy of the executive.[44]

But the variety of non-executive interests and the reasons for their creation, and the effects of changing circumstances, make it difficult to determine precisely what duty the executive owes the non-executive interest.

We first addressed the issue in 1937 in *Schlittler v. Smith*.[45]  Smith conveyed a tract of land to Schlittler, reserving only a one-half term interest in "the royalty rights [on all minerals] that may be produced".[46]  The trial court held that Smith had conveyed the executive right in the entire tract to Schlittler and by his reservation "was to receive one-half of not less than the usual one-eighth royalty reserved by lessors in oil and gas leases."[47]  We disagreed that the reservation required a lease for at least a one-eighth royalty.  There was "nothing whatever to indicate that the royalty to be reserved was the usual one-eighth, although very likely neither of the parties thought it would be less."[48]  Since the parties were to share equally in the royalty, we thought Schlittler's "self-interest . . . may be trusted to protect [Smith] as to the amount of royalty reserved",[49] but added, "[o]f course, there should be the utmost fair dealing on the part of the grantee in this regard."[50]

---

[44] *See* Lee Jones, Jr., *Non-Participating Royalty*, 26 TEX. L. REV. 569, 573 (1948) ("It seems clear that the Texas courts will not leave the royalty owner completely at the mercy of the holder of the exclusive-leasing privilege.").

[45] 101 S.W.2d 543 (Tex. 1937).

[46] *Id.* at 544.

[47] *Id*.

[48] *Id*. at 544-545.

[49] *Id*. at 545.

[50] *Id*.

Though the duty described in *Schlittler* was narrow — to negotiate a fair royalty — another case decided the same day, *Wintermann v. McDonald*, suggested a broader principle at work.[51] *Wintermann* involved the construction of a 1931 enactment and the Texas Relinquishment Act,[52] which authorized the owners of the soil of certain formerly public lands to act as the agent of the State in making oil and gas leases."[53] This statutory right was similar to the common-law executive right. Consistent with our view of the executive right in *Schlittler*, we held that under these statutes, "[t]he landowner owes to the State good faith in the performance of a duty which he has assumed, and he should discharge that duty with prudence and good faith, and with ordinary care and diligence."[54]

We have characterized an executive's duty of utmost fair dealing as fiduciary in nature, so that the discovery rule is invoked in determining when a claim against the executive accrues. In *Andretta v. West*, the Wests leased their property to Superior Oil Co.'s predecessor and later conveyed a one-fourth non-participating interest in their one-eighth royalty to Andretta's predecessor.[55] A dispute arose between the Wests and Superior over whether Superior should have drilled an offset well, and the Wests settled by accepting payment of a one-eighth royalty on

---

[51] 102 S.W.2d 167 (Tex. 1937).

[52] Act approved May 29, 1931, 42nd Leg., R.S., ch. 271, 1931 Tex. Gen. Laws 452.

[53] *Wintermann*, 102 S.W.2d at 170.

[54] *Id*. at 173.

[55] 415 S.W.2d 638, 639 (Tex. 1967).

15

Superior's well on the adjoining tract.[56] We held that Andretta was entitled to one-fourth of the substitute royalty and that limitations on his claim did not begin to run until he knew or should have known of the royalty because he and the Wests were in a confidential relationship, given the power "entrusted" to the Wests by the executive right and their superior knowledge.[57] In *HECI Exploration Co. v. Neel*, we spoke more broadly of our decision in *Andretta*:

> We held that a fiduciary relationship exists between an owner of the executive rights and nonparticipating royalty owners in Andretta's position because the former has the power to make and amend the lease and thereby affect the latter's rights. Because of that fiduciary duty, an amendment to a lease executed and recorded after Andretta acquired his interest was not constructive notice because there was no occasion for him to search the records when he had no reason to know or suspect that West had agreed to a payment in lieu of royalty. We further held that limitations did not commence running until Andretta learned or should have learned of the wrong. That decision is consistent with other Texas decisions in which there was a breach of fiduciary duty.[58]

We again characterized the executive's duty as fiduciary in *Manges v. Guerra*,[59] a complex case[60] involving various dealings between Clinton Manges and his grantors, to whom we will refer for simplicity as Guerra. Manges had acquired, roughly speaking, 93,000 acres of land, together with one-half of Guerra's mineral interest in the property and the executive right in Guerra's retained interest.[61] He first executed a deed of trust covering all the mineral interest to secure a $7

---

[56] *Id.*

[57] *Id.* at 641.

[58] 982 S.W.2d 881, 888 (Tex. 1998) (citations omitted).

[59] 673 S.W.2d 180 (Tex. 1984).

[60] The case was also one of some notoriety. *See* Ken Case, *Blind Justice*, TEXAS MONTHLY, May 1987, at 136.

[61] *Id.* at 181-182.

16

million loan from a bank.[62]  He then contracted with an entity, GPE,, giving GPE an option to buy

production from all properties to which Manges held executive rights, for a loan to use in drilling

and developing the mineral interests.[63]  In essence, the GPE contracts gave Manges the ability to

develop the minerals without leasing them.  After Guerra sued, contending that the GPE contracts

effectively withdrew the minerals from the lease market, Manges leased a large part of the minerals

to himself for a nominal bonus of $5, asserting that Guerra's lawsuit had made it impossible to lease

the minerals to anyone else.[64]

Without objection, the jury was instructed:

[T]he possessor of an [executive right] owes to the co-mineral owners the same
degree of diligence and discretion in exercising the rights and powers granted under
such [e]xecutive [r]ights as would be expected of the average land owner who
because of self-interest is normally willing to take affirmative steps to seek or to
cooperate with prospective lessees . . . that in the exercise of the executive rights, the
holder thereof is required to use utmost good faith and fair dealing as to the interest
of the non-executive mineral interest owners.  You are further instructed that the
holder of the executive rights has a duty to prevent drainage of oil or gas from any
lands covered by the executive rights.  In any lease executed by the holder of the
executive rights, the holder thereof is required to obtain all benefits that could be
reasonably obtained from a disinterested third party.[65]

---

[62] *Id*. at 182.

[63] *Id*. (neither contract required Manges to develop the Guerra lands in particular).

[64] *Id*.

[65] *Id*. at 183.  The first sentence of the instruction appears to have been based on a law review article.  *See* Lee Jones, Jr., *Non-Participating Royalty*, 26 TEX. L. REV. 569, 581 (1948).

The jury found that Manges had violated his duty to Guerra.[66] The trial court rendered judgment on the verdict, canceling, in relevant part, the deed of trust, the GPE contracts, and Manges's lease to himself, and awarding Guerra actual and punitive damages.[67]

We agreed that Manges had breached his duty as executive. The duty of the executive to the non-executive is "fiduciary", we explained, citing cases that have long characterized this relationship as one "of trust",[68] with a duty of "utmost fair dealing".[69] We held that Manges had breached this duty by self-dealing — "in making the lease to himself, in agreeing upon a $5 nominal bonus for 25,911.62 acres of land, and in dealing with the entire mineral interest so that he received benefits that the non-executives did not receive."[70] We affirmed the judgment canceling the lease and deed of trust and awarding punitive damages against Manges for his willful "failure to negotiate for mineral leases with third persons".[71]

A fiduciary duty often, as it would for principle and agent, "requires a party to place the interest of the other party before his own",[72] but we did not suggest in *Andretta*, *HECI*, or *Manges*

---

[66] *Manges*, 673 S.W.2d at 183.

[67] *Id*.

[68] *Id*.

[69] *Manges*, 673 S.W.2d at 183 (citing *Schlittler v. Smith*, 101 S.W.2d 543, 544 (Tex. 1937))and *First Nat'l Bank of Snyder v. Evans*, 169 S.W.2d 754, 757 (Tex. Civ. App.–Eastland 1943, writ ref'd)).

[70] *Id.* at 184.

[71] *Id.* at 184-185.

[72] *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992) (superseded by statute on other grounds as noted in *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex.2002)); *see also National Plan Adm'rs, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007).

that this requirement was part of the executive's duty. Rather, we stated in *Manges* that the executive's duty is to "acquire for the non-executive every benefit that he exacts for himself."[73]

We revisited the issue of the executive's duty to the non-executive most recently in *In re Bass*.[74] Bass owned a tract of some 20,000 acres, burdened by a 2/24ths non-participating royalty. The McGills, heirs of 1/3 of that royalty (2/72nds of the whole), sued Bass, alleging that he had breached his fiduciary duty to them by refusing to lease the minerals in order to force them to sell him their interest.[75] They sought discovery from Bass of privileged seismic data to support their claim that the minerals should be leased.[76] We held that the trial court had abused its discretion in compelling discovery because the McGills had failed to show that they had a valid claim for breach of fiduciary duty:

> Because *Manges* held that the executive owes the non-executive a fiduciary duty, the McGills correctly state that Bass owes them a duty to acquire every benefit for the McGills that Bass would acquire for himself. What differentiates this case from *Manges,* however, is that no evidence of self-dealing exists here. Bass has not leased his land to himself or anyone else. Bass has yet to exercise his rights as the executive. Because Bass has not acquired any benefits for himself, through executing a lease, no duty has been breached. Thus, the present facts are distinguishable from *Manges.* . . . [W]ithout exercising his power as an executive, Bass has not breached a fiduciary duty to the McGills as non-executives. . . . [T]he record . . . fails to show that Bass has breached his duty as the executive . . . .[77]

---

[73] *Manges*, 673 S.W.2d at 183.

[74] 113 S.W.3d 735 (Tex. 2003).

[75] *iId*. at 738.

[76] *Id*. at 743.

[77] *Id*. at 745 (citations omitted).

19

Pointing to the penultimate sentence, Bluegreen and the lot owners argue that the executive cannot breach his duty to the non-executive until the executive power is actually exercised. Hedrick and Lesley counter that this reading of *Bass* places it in tension with *Manges*, which upheld a damage award for a failure to lease — a non-exercise of the executive right. We disagree with Hedrick and Lesley. The tension they see in *Bass* and *Manges* is relieved by the fact that *Manges*' finding of breach was in the context of pervasive self-dealing. In other words, Manges breached his duty not merely because he failed to lease to third parties as opposed to no one at all, but because he failed to lease to third parties as opposed to himself. The tacit assumption in *Manges* was that the minerals would be leased to someone. That was not the assumption in *Bass*, where the parties disputed whether the minerals should be leased at all.

Nevertheless, we do not agree with Bluegreen and the land owners that *Bass* can be read to shield the executive from liability for all inaction. It may be that an executive cannot be liable to the non-executive for failing to lease minerals when never requested to do so, but an executive's refusal to lease must be examined more carefully. If the refusal is arbitrary or motivated by self-interest to the non-executive's detriment, the executive may have breached his duty.[78] While there was an allegation of self-interest in *Bass*, we concluded that it was not sufficiently supported by the record to warranty compelling discovery of privileged information.

But we need not decide here whether as a general rule an executive is liable to a non-executive for refusing to lease minerals, if indeed a general rule can be stated, given the widely

---

[78] To the extent *Aurora Petroleum, Inc. v. Newton*, 287 S.W.3d 373, 376-377 (Tex. App.—Amarillo 2009), and *Hlavinka v. Hancock*, 116 S.W.3d 412, 419-420 (Tex. App.—Corpus Christi 2003), hold differently, we disapprove them.

differing circumstances in which the issue arises. Bluegreen did not simply refuse to lease the minerals in the 4,100 acres; it exercised its executive right to limit future leasing by imposing restrictive covenants on the subdivision. This was no less an exercise of the executive right than Manges's execution of a deed of trust covering Guerra's mineral interest. Bluegreen argues that it did not breach its duty as executive because the restrictive covenants benefitted only its interest in the surface estate, and its mineral interest was treated the same as Hedrick's and Lesley's. But Manges's deed of trust secured loans for his personal benefit and encumbered his mineral interest as well as Guerra's, yet we held that he breached his duty. Following *Manges*, we hold that Bluegreen breached its duty to Hedrick and Lesley by filing the restrictive covenants. The remedy, we think, should be the same as in *Manges*: cancellation of the restrictive covenants.

We recognize that Bluegreen as a land developer acquired the executive right for the specific purpose of protecting the subdivision from intrusive and potentially disruptive activities related to developing the minerals. But the common law provides appropriate protection to the surface owner through the accommodation doctrine.[79]

**V**

Three issues remain.

---

[79] *Tarrant Cnty. Water Control & Imp. Dist. v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993) ("The accommodation doctrine, also known as the 'alternative means' doctrine, was first articulated . . . as a means to balance the rights of the surface owner and the mineral owner in the use of the surface: 'Where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under established practices in the industry there are alternatives available to the lessee whereby minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee.'" (quoting *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex.1971))).

21

*First*: Petitioners, joined by the General Land Office as amicus curiae, argue that if the executive owes them no duty to lease their minerals, they retain the right of development — sometimes referred to as the right of ingress and egress — another "stick" in the bundle of independent property rights comprising the mineral estate.[80] They contend that they may engage in self-development of their minerals, even if the executive refuses to lease.[81] We have stated that "the right to develop is a correlative right and passes with the executive rights."[82] By this rule, petitioners have no right to develop. Having rejected the premise of their argument, and holding instead that they are owed a duty by the executive, we decline to reconsider the relation between the right to develop and the executive right.

*Second*: Petitioners contend that by filing the restrictive covenants without notice to them, Bluegreen breached a provision in the Lesley deeds. The court of appeals held that Bluegreen was not bound by the provision because it was contractual between Lesley and Bluegreen's predecessor and not a covenant running with the land.[83] We agree with the court of appeals' reasoning and its conclusion.

*Third*: Although not all of the lot owners appealed the trial court's judgment, the court of appeals concluded that the rights of the parties were so interwoven that its decision should apply to

---

[80] *Supra* note 1.

[81] *See also* Christopher Kulander, *Big Money vs. Grand Designs: Revisiting the Executive Right to Lease Oil & Gas Interests*, 42 TEX. TECH. L. REV. 33, 73-74 (2009) (discussing possible benefits from separating the executive right from the right to self-develop).

[82] *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 n.1 (Tex. 1995) (citing *Day & Co. v. Texland Petroleum, Inc.*, 786 S.W.2d 667, 669 n.1 (Tex. 1990)).

[83] 281 S.W.3d at 621-622.

all the parties in the trial court.[84]  No one has raised the issue here, and we likewise conclude that our decision should apply to all parties in the trial court.

*      *      *

The judgment of the court of appeals is affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings in accordance with our opinion

_____
Nathan L. Hecht
Justice

Opinion delivered: August 26, 2011

---

[84] 281 S.W.3d at 617 n.5.