ANN CRAWFORD McCLURE, Chief Justice
This appeal arises from two townhome duplex owners, Alfred "Corky" Belanger and Michael Drennan, who brought breach of contract, trespass, negligence, and diversion of water claims against their homeowners association and its management company.
FACTUAL AND PROCEDURAL BACKGROUND
Lakeside Village
Lakeside Village is a gated townhome community comprised of 498 units by a lake in Rockwall County, Texas. It is governed by a homeowners association, which we refer to as Lakeside. Lakeside's Board of Directors consists of nine members and four officers. The board members live in the community and are not paid, but rather, volunteer their time. Property that is not privately owned by the residential owners is owned by and subject to the control of Lakeside and is referred to as the "common area." For example, Lakeside is responsible for the 13,500 square feet of streets, 7,800 square feet of retaining walls, street lights, tennis courts, the pool, the gym, and the golf course. Lakeside has owned and controlled the common areas at all relevant times concerning this lawsuit.
The Declaration of Covenants, Articles of Incorporation, and By-Laws
The documents governing the duties and responsibilities of Lakeside are set forth in the applicable Declaration of Covenants, Conditions and Restrictions (as amended)(the Declaration), Articles of Incorporation (as amended)(the Articles), and the Amended and Restated By-Laws (the By-Laws).
The Declaration was executed on September 27, 1971, and subsequently amended on October 3, 1974, and on July 1, 1977. Pursuant to the Declaration, "common area" means "all real property owned by [Lakeside] for the common use and enjoyment of the owners," and "owner" is defined as "the record owner, whether one or more persons or entities, of a fee simple title to any Lot which is part of the Properties, including contract sellers, but excluding those having such interest merely as security for the performance of an obligation." Article IV, entitled "Covenant for Maintenance Assessments" provides:
Section 1. Creation of the Lien and Personal Obligation of Assessments. [Lakeside *22 Village], for each Lot owned within the Properties, hereby covenants, and each Owner of any Lot by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree to pay to the Association: (1) annual assessments or charges and (2) special assessments for capital improvements within the Common Areas, such assessments to be established and collected as hereinafter provided; ...
Section 2. Purpose of Assessments. The assessments levied by the Association shall be used exclusively to promote the recreation, health, safety, and welfare of the residents in the Properties, for the improvement and maintenance of the Common Area, and of the homes situated upon the Properties.
The Articles of Incorporation provide:
In order to provide for the health, safety and welfare of the owners of the lots within the above-described property, ... the following specific purposes are adopted:
To exercise all of the powers and privileges to perform all of the duties and obligations of the corporation as set forth in that certain Declaration of Covenants, Conditions and Restrictions ...
To ... own, hold, improve, build upon, operate, maintain, ... real property....
To erect, construct, maintain, improve, rebuild, enlarge, alter, manage, control, furnish, decorate, and fit up any and all kinds of buildings and structures of every description and which can lawfully be done under the laws of the State of Texas.
Finally, the By-Laws give the Board of Directors the power to take all legal acts, including making reasonable rules and regulations pertaining to all common areas. The By-Laws authorize the Board to regulate the use, maintenance, repair, replacement, modification, and appearance of the common areas and to make additional improvements in the common area.
Principal Management Group of North Texas/Principal Management Group, Inc.
Principal Management Group, Inc. (Principal) is Lakeside's property manager for the Lakeside Village community. Lakeside contractually engaged Principal to be its managing agent in January 2005. A Management Agreement governed the parties' relationship. According to Terry Tolleson, Lakeside's president in 2011, Lakeside did not delegate any decisions regarding capital improvements to Principal. James Heck, Principal's Director of Association Services, testified that Principal is responsible for maintaining Lakeside's common areas. Specifically, the Management Agreement provides that subject to availability of funds, Principal will maintain Lakeside's common elements in accordance with reasonable standards acceptable to Lakeside's Board. Principal was authorized, under the general supervision of Lakeside's Board, to: (1) maintain office hours on site at Lakeside Village; (2) spend approximately one hour, during office hours, inspecting Lakeside in addition to the above mentioned office hours; (3) establish liaison with contractors for corrective work on common elements in accordance with Lakeside's competitive bid requirements; (4) periodically inventory all of Lakeside's assets, recommend purchase of same where necessary, and provide Lakeside with a copy of each inventory from time to time; (5) ensure that its managers are available by telephone and email during business hours and after hours for emergencies; (6) maintain business-like relations with Owners and their tenants, whose service requests, questions and complaints shall be received, considered, *23 recorded in a systematic fashion and responded to promptly and efficiently; (7) requests or complaints which are deemed extraordinary by Principal shall after thorough investigation, be reported to Lakeside's Board with appropriate recommendations; (8) recruit, hire, train, supervise and discharge all Project personnel, except for the maintenance staff employed by the Association; (9) supervise and direct Lakeside's maintenance staff in accordance with a Project plan to be prepared by Principal on a weekly basis and submitted to the Lakeside's president for approval; (10) Lakeside's maintenance supervisor shall have a dual reporting function to the Board's president and Principal's Portfolio Manager, except however, Principal has no authority to discharge Lakeside's supervisor or other employees; (11) conduct periodic physical inspections of the property; (12) subject to availability of funds, maintain common elements of Project in accordance with reasonable standards acceptable to the Board; (13) negotiate and make contracts for services, including utilities, trash remove, law maintenance, pest control and such other contract services as may be necessary and advisable, subject to Board approval and competitive bid procedures. Additionally, Principal was authorized to enforce Lakeside's covenants and provide fiscal and accounting services, which include preparing an annual budget for the next fiscal year. Finally, Principal was authorized to prepare any special reports in accordance with Lakeside's requests and maintain records and collect any fees and assessments.
Subject Townhouse Duplex
The properties involved in this lawsuit, 3805 Mediterranean (Drennan's property) and 3809 Mediterranean (Belanger's property)(collectively, the duplex property), are connected by an interior wall and a foundation wall, thereby making the units a duplex. East of the properties is the common area, except for a small area immediately adjacent to the party wall. When both properties were purchased, railroad tie retaining walls were located on the common areas to the north, east, and south of the duplex property.
Rockwall County's soil consists primarily of sandy clay. This is significant to a structure's foundation, as sandy clay is highly receptive to moisture and can cause the foundation of a house to swell and contract. The duplex property at issue was built in the early 1980s, around the same time that many of the railroad tie retaining walls were built. The duplex was built on a single foundation with a cripple wall down the middle. A cripple wall, sometimes referred to as an extension wall, is a mechanism used to extend the top grade beam to level two properties, so that the duplex property would not look like a split level dwelling from the outside. Instead of resting on top of the concrete foundation, the main floor of the duplex property relies upon the cripple wall for support, which is made out of several two-by-four boards. Due to the change in elevation, the crawl space underneath a portion of the duplex property is so large that one can walk directly into it. Upon entering the crawl space and looking to the right, one observes a slope continuing down to the south and to the west. As one continues in the southwest direction of the crawl space, the distance between the ground and the main floor increases.
Testimony at trial indicated that there was a drainage pipe that was supposed to be connected to an inlet drain on the outside of the duplex property, so that it would collect water from the retaining wall behind the duplex property and direct it away from the property. Instead, the pipe carried water from the retaining wall to a catch basin located in the crawlspace underneath *24 the foundation of the duplex. Belanger's property also had a gutter system with downspouts that Donald Scott, chairman of Lakeside's Capital Expenditure Committee, believed was pushing water to the backside of the retaining wall.
Alfred "Corky" Belanger
Belanger became a resident of Lakeside Village in 2003. He owns two townhomes. He resides in 3836 Mediterranean and owns unit 3809 Mediterranean, which is the subject of this suit. According to the seller's disclosure at the time of sale of 3809 Mediterranean, the previous owner "added a French drain in the back and guttering as preventative measures." Some witnesses speculated that this French drain was the same drainage pipe discussed above that was carrying water to a catch basin in the crawlspace. Belanger was advised to address this issue, but did not do so.
A 2003 inspection report for 3809 Mediterranean noted that "grading is flat at south and southeast corner of house. Water is standing in this area, and all grading should slope away from the house with no low spots." The report also indicated only minor, normal movements in the foundation. An inspection conducted in 2011 revealed significant structural changes since 2003. (RR9 at 65). The 2003 inspection indicated that there were only minor cracks in the foundation which did not require any kind of maintenance, while the 2011 inspection report revealed excessive cracking which needed to be repaired.
2005 Reserve Study
In 2005, Lakeside arranged for an engineering reserve study to determine long and short term needs for capital improvements. A Capital Expenditure Committee was created as a result. The study revealed that the railroad tie retaining walls on Upper Mediterranean Drive behind the duplex property needed to be replaced as a single event in 2006 because the walls were structurally failing. The walls were located only five feet from the duplex property. In 2006, Lakeside considered imposing a special assessment of $150,000 but the assessment did not pass a vote of the membership. In 2007 and 2008, railroad tie retaining walls located elsewhere in the community were replaced in phases.
Pam Slovak, Lakeside's president in 2009 and 2010, initially testified that in 2005, Lakeside did not have sufficient funds to repair the retaining wall behind the duplex property. Despite this testimony, she later acknowledged that in 2005, Lakeside's reserve fund contained $195,560. In 2010, Lakeside HOA maintained $282,490 in reserve funds. Slovak also revealed that from 2006 until 2013, the capital reserve budget contained sufficient funds to repair the retaining wall behind the duplex property. But Lakeside did not immediately replace the retaining wall behind Belanger's and Drennan's properties because it was the most complex of all the walls due to its turns, varying heights and elevations. It would be the most expensive to replace and would require engineer and City permits. Despite learning of the condition of the retaining walls in 2005, Lakeside never informed its residents or gave them an opportunity to discuss or vote on the issue. According to Slovak, it was the Board's decision to make.
Belanger's Complaints
Belanger first noticed issues with 3809 Mediterranean beginning in late 2007 and early 2008. His tenant contacted him concerning some cracks and water issues with the driveway. Belanger first notified Lakeside sometime in 2009 concerning the cracks in the driveway. According to Belanger, more and more cracks formed and *25 water continued to appear and flow through the property. In October 2009, Scott responded to Belanger's water complaints. By 2010, Belanger testified that at least three board members were aware of the issues with his property, but did nothing about it. Moreover, even though Belanger's driveway was actually part of the common area, Lakeside informed him that because it was his driveway, he needed to repair it.
In November 2010, Belanger advised Lakeside that his air conditioning unit slid down the hill. He requested that someone come out and repair the area. Lakeside only provided a temporary fix, relocating his AC unit onto a concrete pad surrounded by a plywood wall. When Lakeside relocated the unit, it did not address the issues with the retaining wall.
Belanger subsequently emailed Lakeside, asking them to inspect his property and determine whether the problem areas were common areas or his own private property, so that the responsibility to repair could be properly delegated. He received no response from the Board. He sent another five or seven emails asking for the issues to be addressed. As a result of Belanger's complaints, an email exchange occurred between Slovak and Kitty Elder, Principal's on-site Lakeside Village manager, in which Slovak relayed to Elder that she was uncomfortable replying to Belanger's emails without guidance. Slovak's email asked for legal advice from a law firm, specifically someone who could "put the right words together so [Lakeside] HOA is protected."
Belanger testified that the damage to his townhome included black mold in the crawlspace and interior damage. The entire property is now tilted, the wall has completely separated from the stucco, and a portion of the back wall is cracked.
Drennan's Complaints
Drennan became a resident of Lakeside Village in 2011. He owns 3805 Mediterranean, one of the properties subject to this suit. Drennan did not inspect the home prior to purchase. He was aware the unit was situated on the down slope of a hill, and that a railroad tie retaining wall was located behind the duplex property. However, prior to purchase, Drennan did receive a Resale Certificate from Principal, prepared by Elder, Principal's on-site Lakeside Village manager.
Drennan testified that he too started having issues with water leaks and flooding to his driveway. The retaining wall behind his property was visually rotting. Like Belanger, various walls in Drennan's townhome were cracked and the paint was splitting; sheets of drywall were separating; and portions of his hardwood floors were raised and separating. Despite these issues, Drennan did not contact Lakeside.
Drennan then found a set of construction plans in his townhome, dated 1981, that appeared to be the construction plans for the duplex property. He gave Ernest Hedgcoth a copy of these plans. Hedgcoth is an engineer who inspected the properties and testified as an expert witness. For a construction plan to become the official plan for a structure, it must contain architect and engineering seals and be on file with the County. These 1981 construction plans contained no official architect or engineering seal. They were not on file with the County and there is no evidence to indicate whether these plans were actually used to construct the property. Nonetheless, Lakeside and Principal heavily relied on these specific 1981 construction plans to maintain their argument that the ultimate damage to Belanger's and Drennan's properties was a result of improper design and construction rather than a result of the improperly functioning retaining wall. Specifically, *26 Lakeside and Principal argued that if the duplex had been properly constructed according to the 1981 construction plans, none of the damage would have occurred. The 1981 construction plans contained the name, Graphic Design Group, but the extent of the group's involvement is unknown.
2010 Reserve Study
A second Reserve Study was conducted in October 2010. It provided for five year expenditures (2010-2015) totaling $1,338,530, which did not include day-to-day operating expenses. It recommended that replacement of the retaining walls should begin in 2011 and be completed by 2013. Slovak testified that Lakeside did not have sufficient reserve funds available to tackle all the recommended projects, in part because members failed to pay their dues.
In 2011, Lakeside sought a special assessment to contribute to the reserve account, but the members voted against it. Repairs to the front gate were also needed at this time because Rockwall City codes required that the front gates be widened to allow for entry of emergency vehicles. The project was more time consuming and cost intensive than initially thought because it had to be completely redone after there was opposition from residents who objected to temporary traffic on their streets. The new construction of the front gate was more complex and required the work to be done in stages.
Prior to an April 2011 Board meeting, Lakeside received three bids for the repair of the railroad retaining wall behind the duplex. Before it could move forward with any of the proposed bids, it needed an engineering report and approval from the City of Rockwall. Lakeside never acted on any of the three bids.
Ernest Hedgcoth's Testimony
Hedgcoth testified extensively concerning the effect of the retaining wall's condition upon the duplex. He was of the opinion that property damage occurred because of the failing retaining wall. Had a proper concrete retaining wall accompanied by catch basins and weep holes been installed behind the duplex, water would have been allowed to seep out and not build up and exert pressure against the wall. Hedgcoth explained that lateral pressure occurs when drainage builds up until it pushes against the wall and gradually pushes the retaining wall towards the downhill slope. The retaining wall behind the property did not allow the water to properly flow through a weep hole, so the lateral pressure continued to exert significant pressure on the property's foundation, eventually rotating the cripple wall underneath the house and separating the stucco approximately three or four inches from the actual wall. Hedgcoth further opined that as the retaining wall directed water onto the southeastern corner of Belanger's property, it caused erosion. The rotation of the cripple wall and cracking of the stucco occurred on the east side of the property, and mold was found on the southeastern side of Belanger's property. According to Hedgcoth, it would have been unreasonable for either Belanger or Drennan to make repairs to the foundation before the external retaining wall issues were addressed because the retaining wall would continue to damage the foundation until repaired. Several witnesses testified that the water coming from the retaining wall onto the southeastern corner of the property was not from a capped water well, spring, the result of a sprinkler leak, or broken waterline.
Philip Robins' Testimony
In 2011, Lakeside retained Philip Robins, an engineer, to perform drainage work *27 throughout the community and to work on the front gate project. Robins discussed with Lakeside a plan to reduce the erosion and water drainage problems that were occurring with the retaining wall. He specifically testified that the rain gutters located on Belanger's property were not the cause of the damage. The damage was caused by the external lateral forces and running water coming from the retaining wall. Robins agreed that it would be unreasonable for Belanger and Drennan to address the foundation issues before the retaining wall was repaired, because damage would continue to recur until the retaining wall repairs were addressed. Robins' bid to repair the retaining walls, which was one of the three bids Lakeside obtained in 2011 but never acted upon, was $49,455. Lakeside told him that they wanted a less expensive bid. Robins told them that he would not complete the project for less because it would comprise the integrity of the retaining wall.
Renata Woods' Testimony
Woods testified as Lakeside's and Principal's expert witness. She investigated the retaining wall behind the duplex and reviewed the 1981 construction plans found in Drennan's townhome. Woods was of the opinion that the construction of the duplex caused the damage to the foundation, rather than the condition of the retaining wall:
Nothing that you could do with this retaining wall, no matter what type of retaining wall it is, would have stopped this condition. This retaining wall would not have alleviated the forces on this foundation wall.
Contrary to Robins' and Hedgcoth's opinions, Woods believed that there was nothing preventing Belanger and Drennan from moving forward with the repairs to their foundation because the retaining wall was an entirely different entity. One did not impact the other. In other words, the retaining wall was not dependent on the house for support and the house was not dependent on the retaining wall for support. She observed no issues regarding the need to divert water from the hill through the duplex property. Her final opinion related to the cause of the foundation's failure, which she characterized as a result of improper design and construction.
Initial Lawsuit Filed
In November 2011, Belanger filed suit against Lakeside and Principal, alleging a violation of the water code, trespass, and negligence. He asserted that there was a diversion of surface water in violation of Section 11.086 of the Texas Water Code. He next alleged that Lakeside and Principal knowingly and/or intentionally diverted surface water onto his property constituting a trespass. Finally, Belanger claimed that Lakeside and Principal were negligent in maintaining and operating the common area in such a manner as to improperly divert surface and/or subsurface water onto or under his property, proximately causing damage to his property.
Retaining Wall Rebuilt
The City of Rockwall issued a building permit in January 2013 for a stone retaining wall to be built behind the duplex. Lakeside ultimately hired engineer Thomas Daniel to design and construct the new wall. The new retaining wall was engineered stacked stone. It stopped at the end of Drennan's townhome, which is located on the far north side of the community. According to Scott, after the railroad tie retaining wall was replaced, Lakeside determined that the railroad tie retaining wall actually doing what it was designed to do. As a result, the remainder of the railroad tie retaining wall (which extended well past the duplex property) was not replaced with the new concrete retaining *28 wall. Hedgcoth, however, believed that the new concrete retaining wall still did not provide proper drainage. Water continued to wash down the hill and onto the southeast corner of Belanger's property.
Amended Pleadings
Drennan was added as a plaintiff to the lawsuit and in May 2013, Belanger and Drennan filed their fifth amended petition. It alleged the following causes of action: (1) breach of contract; (2) violation of Section 11.086 of the Texas Water Code ; (3) trespass; (4) negligence; and (5) intentional conduct/gross negligence. In addition to seeking compensatory damages and attorneys' fees, Belanger and Drennan sought specific performance regarding the repair of the retaining wall and Belanger's driveway. The petition finally alleged that the plaintiffs' recovery should not be limited by the damage caps under Chapter 84 of the Texas Civil Practice & Remedies Code.
Trial, Verdict and Judgment
A trial by jury began in January 2015. It lasted approximately a month, and in February, each side filed its proposed charge. Lakeside moved for a directed verdict on breach of contract, attorneys' fees, specific performance, trespass, water code violation, negligence, and gross negligence. Principal similarly moved for directed verdict on Belanger and Drennan's trespass, water code violation, negligence, and gross negligence claims. The trial court denied all motions for directed verdict.
At the charge conference, Lakeside and Principal objected to the submission of all questions and the trial court overruled all objections. The court then submitted the charge, which contained a total of twenty questions. The jury returned a judgment in favor of Belanger and Drennan against Lakeside and Principal. Belanger and Drennan subsequently moved for entry of final judgment, which included a suggested remittitur of $28,000 by Belanger and a suggested remittitur of $16,000 by Drennan. Lakeside and Principal opposed the motion for entry of judgment, arguing that there was no evidence, or insufficient evidence, to support the jury's findings with respect to liability, damages, or specific performance.
The trial court entered a final judgment in March 2015. The judgment granted in favor of Belanger provided:
Lakeside HOA Past actual damages (includes $28,000 remittitur): $75,800Prejudgment Interest: 5%Future actual damages: $12,600Attorneys' fees throughout trial: $160,000Attorneys' fees in the Court of Appeals: $22,500Attorneys' fees in the Texas Supreme Court: $11,500
Principal Past actual damages: $37,900Prejudgment interest: 5%
The trial court granted judgment in favor of Drennan as follows:
Lakeside HOA Past actual damages (includes $16,000 remittitur): $22,500Prejudgment interest: 5%Attorneys' fees throughout trial: $70,000Attorneys' fees in Court of Appeals: $22,500Attorneys' fees in the Texas Supreme Court: $11,500
Principal Past actual damages: $11,250Prejudgment interest: 5%
The judgment provided for joint and several liability of the defendants, post judgment interest, and assessed taxable costs. As to Belanger's and Drennan's claim for specific performance, the final judgment *29 provided: In response to Questions 17, 18, 19 and 20, the jury found that [Lakeside HOA] failed to comply with its obligations to Alfred "Corky" Belanger and Michael Drennan under the [Declaration] regarding: (1) reconstruction in 2013 of the retaining wall complex located in the common area around the Belanger and Drennan properties, and (2) maintenance, repair, improvement, or reconstruction of the common portions of the driveways of Belanger's and Drennan's properties.
Based on these jury findings, the Court finds that Alfred 'Corky' Belanger and Michael Drennan are entitled to a judgment of specific performance against [Lakeside HOA], for specific performance. It is hereby ordered, adjudged and decreed that [Lakeside HOA] shall:
Replace those portions of the driveways of Alfred 'Corky' Belanger and Michael Drennan which rest in the common area of Lakeside Village in a manner in compliance with the [Declaration] and generally accepted construction and engineering techniques within 180 days of the signing of this Judgment;
Repair, replace or construct such retaining walls, including water and drainage processes, in the common area of Lakeside Village in the vicinity of the town homes owned by Alfred 'Corky' Belanger and Michal Drennan in compliance with the [Declaration] and generally accepted construction and engineering techniques within 180 days of the signing of this Judgment.
Appellants raise a total of eighteen issues which can be grouped into seven categories: (1) breach of contract claims; (2) specific performance claims; (3) Texas water code challenge; (4) trespass claims; (5) a negligence claim; (6) specific claims related to Principal only; and (7) challenges to the jury's award of damages. We will address the claims in that order.
BREACH OF CONTRACT
Lakeside's first three sub-issues relate to duty. Its main contention is that the trial court erred (1) in determining whether a duty was owed under the agreement and (2) in subsequently submitting the issue of duty to the jury. The remainder of the breach of contract issues concern sufficiency of the evidence. We begin with charge error.
We review charge error for an abuse of discretion. Financial Ins. Co. v. Ragsdale , 166 S.W.3d 922, 926 (Tex.App.-El Paso 2005, no pet.). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." Walker v. Gutierrez , 111 S.W.3d 56, 62 (Tex. 2003), citing Downer v. Aquamarine Operators, Inc. , 701 S.W.2d 238, 241-42 (Tex. 1985). In reviewing the charge, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. De Leon v. Furr's Supermarkets, Inc. , 31 S.W.3d 297, 300 (Tex.App.-El Paso 2000, no pet.). Even if the trial court has abused its discretion, we reverse only when the error is shown to be harmful. Boatland of Houston, Inc. v. Bailey , 609 S.W.2d 743, 749-50 (Tex. 1980). "We may not reverse unless the error, when viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment." Braudrick v. Wal-Mart Stores, Inc. , 250 S.W.3d 471, 475 (Tex.App.-El Paso 2008, no pet.), quoting De Leon , 31 S.W.3d at 300.
Rule 277 governs the submission of questions to the jury. TEX.R.CIV.P. 277. A trial court commits error if it submits a question of law to the jury. See *30 Knutson v. Ripson , 163 Tex. 312, 354 S.W.2d 575, 576 (1962).
The restrictions contained in the governing documents are restrictive covenants concerning real property. See TEX.PROP.CODE ANN. § 202.001(4) (West 2014). Restrictive covenants are subject to the general rules of contract construction. Uptegraph v. Sandalwood Civic Club , 312 S.W.3d 918, 925 (Tex.App.-Houston [1st Dist.] 2010, no pet.), citing Pilarcik v. Emmons , 966 S.W.2d 474, 478 (Tex. 1998) ; Aghili v. Banks , 63 S.W.3d 812, 816 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). A condominium owner may maintain a cause of action for breach of the covenants. See Mitchell v. LaFlamme , 60 S.W.3d 123, 131 (Tex.App.-Houston [14th Dist.] 2000, no pet.). As when interpreting any contract, our primary duty in construing a restrictive covenant is to ascertain the parties' intent. Bank United v. Greenway Improvement Ass'n , 6 S.W.3d 705, 708 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). We focus on the parties' objective, rather than subjective intent, as that intent is reflected in the written contract. See Lopez v. Munoz, Hockema & Reed , 22 S.W.3d 857, 861 (Tex. 2000). We must examine the covenant as a whole in light of the circumstances present when the covenant was made, and give a restrictive covenant's words and phrases their commonly accepted meaning. See Pilarcik , 966 S.W.2d at 478 ; Truong v. City of Houston , 99 S.W.3d 204, 214 (Tex.App.-Houston [1st Dist.] 2002, no pet.) ; see also Owens v. Ousey , 241 S.W.3d 124, 129-30 (Tex.App.-Austin 2007, pet. denied) (explaining that we construe restrictive covenants as a whole in light of the circumstances at the time the parties entered into the agreement, giving effect to every sentence, clause, and word of a covenant, and avoiding constructions that would render parts of the covenant superfluous or inoperative).
Whether a contract has been breached is a question of law for the court, not a jury question. ITT Commercial Finance Corp. v. Riehn , 796 S.W.2d 248, 253 n.3 (Tex.App.-Dallas 1990, no writ) ; Barton v. Davis , 441 S.W.2d 299, 300-01 (Tex.Civ.App.-El Paso 1969, writ ref'd n.r.e.) ; Foerster v. Peoples , 362 S.W.2d 918, 918 (Tex.App.-Amarillo 1962, no writ) ; see also TEX.R.CIV.P. 277. Even the most expansive application of Rule 277 does not authorize the submission of questions of law to the jury. See TEX.R.CIV.P. 277. The trial court must examine the contract and determine what conduct is required of the parties. Riehn , 796 S.W.2d at 253 n.3. Then, insofar as there is a dispute concerning the failure of a contract party to conduct itself in accordance with contract requirements, the court should submit the disputed fact question to the jury. See Various Opportunities, Inc. v. Sullivan Investments, Inc. , 677 S.W.2d 115, 120 (Tex.App.-Dallas 1984, no writ) (jury may properly be asked whether acts specific in contract occurred); Bennett v. Span Industries, Inc. , 628 S.W.2d 470, 474 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.) (when the facts underlying the duty question are in dispute, the question of duty is for the fact finder).
Here, Question One asked:
Did Lakeside fail to comply with its obligation under its Agreement with Belanger regarding use, maintenance, repair, improvement, or re-construction of the common areas in question?
'Agreement' as used in this question refers to the Declaration of Covenants, Conditions and Restrictions of Lakeside dated September 27, 1971 and as subsequently amended.
*31 Answer 'Yes' or 'No'
The jury answered 'Yes.'
Question Two asked:
Did Lakeside fail to comply with its obligations under its Agreement with Drennan regarding use, maintenance, repair, improvement, or re-construction of the common areas in question?
'Agreement' as used in this question refers to the Declaration of Covenants, Conditions and Restrictions of Lakeside dated September 27, 1971 and as subsequently amended.
Answer 'Yes' or 'No'
The jury also answered 'Yes' to Question Two.
Lakeside insists that the trial court erred in conducting its initial inquiry to accurately ascertain its duties as set forth in the Declaration. Had the trial court done so, Lakeside contends that it would have decided the breach of contract issue in favor of Lakeside as a matter of law and the submission of Questions One and Two to jury would never have been submitted. We disagree and concluded that error, if any, was harmless. The trial court properly determined the duties under the agreement and subsequently submitted the factual dispute to the jury.
The documents governing the duties and responsibilities of Lakeside are set forth in the Declaration, the Articles of Incorporation, and the By-Laws. Pursuant to the Declaration, "common area" means "all real property owned by the Association for the common use and enjoyment of the owners," and "owner" is defined as the "the record owner, whether one or more persons or entities, of a fee simple title to any Lot which is a part of the Properties, including contract sellers, but excluding those having such interest merely as security for the performance of an obligation." The Declaration further provides that Lakeside is authorized to collect from each lot Owner an annual assessment or charge and special assessments for capital improvements within the Common Area. These assessments "shall be used exclusively to promote the recreation, health, safety, and welfare of the residents in the Properties, for the improvement and maintenance of the Common Area and of the homes situated upon the Properties." The Articles of Incorporation provide:
In order to provide for the health, safety and welfare of the owners of the lots within the above-described property, ... the following specific purposes are adopted: 1) [t]o exercise all of the powers and privileges to perform all of the duties and obligations of the corporation as set forth in that certain Declaration of Covenants, Conditions and Restrictions ... 3) [t]o ... own, hold, improve, build upon, operate, maintain, ... real property ... 8) [t]o erect, construct, maintain, improve, rebuild, enlarge, alter, manage, control, furnish, decorate, and fit up any and all kinds of buildings and structures of every description and which can lawfully be done under the laws of the State of Texas.
The By-Laws give Lakeside the power to take all legal acts, including making reasonable rules and regulations pertaining to all common areas. The By-Laws authorize the Board of Directors to regulate the use, maintenance, repair, replacement, modification, and appearance of the common areas and to make additional improvements in the common areas.
This evidence was before the trial court in determining whether a duty existed between the parties.[1] The trial court determined *32 that a duty existed and submitted the fact question concerning Lakeside's alleged failure to conduct itself in accordance with the contract requirements. Bennett, Inc. , 628 S.W.2d at 474. Any definition or description of the terms of the Agreement would be surplusage because the jury was not asked to determine whether a duty existed; it was only asked whether Lakeside complied with its obligations. We conclude that error, if any, from the trial court's reference to the "Agreement" in Questions One and Two was harmless. We overrule the challenges to the charge.
We next determine whether sufficient evidence supports the jury's finding that Lakeside breached its duties to Belanger and Drennan. We do so because Lakeside contends that since there is insufficient evidence to support a finding of breach, Belanger and Drennan cannot recover reasonable attorneys' fees. Texas law permits the recovery of attorneys' fees on a breach of contract action under Section 38.001(8) of the Texas Civil Practice & Remedies Code. Candlewood Creek Neighborhood Ass'n v. Gashaye , No. 05-11-00380-CV, 2012 WL 3135721, at *2 (Tex.App.-Dallas Aug. 2, 2012, no pet.).[2] Furthermore, Article VIII of the Declaration provides that owners can collect reasonable attorneys' fees and all court costs.
In deciding Lakeside's legal sufficiency claims, we are mindful that an appellate court will sustain a legal sufficiency or "no-evidence" challenge only if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. City of Keller v. Wilson , 168 S.W.3d 802, 810 (Tex. 2005) ; Kohannim v. Katoli , 440 S.W.3d 798, 811 (Tex.App.-El Paso 2013, pet. denied). In conducting our review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. City of Keller , 168 S.W.3d at 822 ; Kohannim , 440 S.W.3d at 811.
We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. Id. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. Id. at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review.
*33 Id. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. Id. at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to make the finding under review. Id. at 827.
When an appellant challenges the factual sufficiency of an adverse finding on which the other party had the burden of proof, the appellant must demonstrate that there is insufficient evidence to support the adverse finding. Rhey v. Redic , 408 S.W.3d 440, 449 (Tex.App.-El Paso 2013, no pet.) ; Escalante v. State Office of Risk Management , 355 S.W.3d 341, 345 (Tex.App.-El Paso 2011, no pet.). We will consider, weigh, and examine all of the evidence in the record, both in support of, and contrary to, the finding. Rhey , 408 S.W.3d at 449 ; Escalante , 355 S.W.3d at 345. The trial court's findings will be set aside only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Rhey , 408 S.W.3d at 449 ; see City of Keller , 168 S.W.3d at 822. When the evidence is conflicting, we must presume that the fact-finder resolved the inconsistency in favor of the challenged finding if a reasonable person could do so. See City of Keller , 168 S.W.3d at 821.
It is undisputed that the retaining wall behind the duplex was part of the common area to be maintained by Lakeside. Belanger's driveway was also uniquely platted as part of the common area of the community, rather than his own personal property. Lakeside was responsible for maintaining, repairing, improving, and reconstructing the common areas. The 2005 Reserve Study informed Lakeside that the retaining wall behind the duplex was failing and needed to be replaced. Scott, Lakeside's Capital Expenditures Chairman, knew the function of a retaining wall was to retain dirt, resist force, and properly divert water, and even acknowledged that a failing retaining wall can redirect water to unintended areas. Moreover, Belanger notified Lakeside, through multiple complaints and emails, that his driveway and the retaining wall had issues that needed to be addressed. The 2010 Reserve Study reemphasized the deficiencies in the retaining wall and recommended that replacement begin the next year.
Evidence also revealed that from the time Lakeside became aware of the issues in 2005 until the retaining was finally replaced in 2013, sufficient funds existed to repair it. Despite this, Lakeside did not replace the wall until eight years later.
Hedgcoth's testimony established that the cause of the foundation damage was the retaining wall's deficiencies, including its ineffective drainage system, which allowed the lateral pressure to build and place significant pressure on the foundation, rotating the cripple wall. Expert witness Robins agreed. From this, we conclude that a reasonable jury could have found that Lakeside breached its duty by failing to maintain the retaining wall behind the duplex causing damage to Appellees' properties. Because the evidence supports the jury's finding that a breach occurred, the recovery of attorneys' fees was permitted.
Lakeside next contends that Belanger and Drennan should not have been entitled to specific performance. Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of a breach of contract. Paciwest, Inc. v. Warner Alan Properties, LLC , 266 S.W.3d 559, 571 (Tex.App.-Fort Worth 2008, pet. denied) ;
*34 Stafford v. S. Vanity Magazine , 231 S.W.3d 530, 535 (Tex.App.-Dallas 2007, pet. denied). Like a breach of contract claim, only disputed issues of fact are submitted to the jury. Stafford , 231 S.W.3d at 537.
Lakeside reurges its position that charge error in Questions 17, 18, 19, and 20, like the purported charge error in Questions 1 and 2, require reversal. Because we have determined that referencing the Agreement in the questions, even if error, was harmless, we adopt our analysis above and reach the same conclusion here. We overrule Lakeside's breach of contract claims.
WATER CODE VIOLATION
Lakeside and Principal next argue that there is insufficient evidence to support a finding that they violated Section 11.086(a) of the Texas Water Code by diverting surface water onto Belanger's property. We have already articulated the pertinent standard of review for evidentiary sufficiency.
Section 11.086(a) of the Texas Water Code provides that "[n]o person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." TEX.WATER CODE ANN. § 11.086(a) (West 2008); see Contreras v. Bennett , 361 S.W.3d 174, 178 (Tex.App.-El Paso 2011, no pet.) ; Bily v. Omni Equities, Inc. , 731 S.W.2d 606, 611 (Tex.App.-Houston [14th Dist]. 1987, writ ref'd n.r.e.) (cases discussing the elements of a Section 11.086(a) water code violation). Surface water is "[t]hat which is defused over the ground from falling rains or melting snows, and continues to be such until it reaches some bed or channel in which water is accustomed to flow." Dalon v. City of DeSoto , 852 S.W.2d 530, 538 (Tex.App.-Dallas 1992, writ denied), quoting City of Princeton v. Abbott , 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied). Surface waters do not follow a defined course or channel and do not gather or form a natural body of water. Dalon , 852 S.W.2d at 538. When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface water. Id. The chief characteristic of surface water is its inability to maintain identity and existence as a body of water, distinguishing it from water flowing in a natural watercourse. Id.
The statutory elements are: (1) a diversion or impoundment of surface water which (2) causes (3) damage to the property of the plaintiff landowner. Kraft v. Langford , 565 S.W.2d 223, 229 (Tex. 1978) ; Bily , 731 S.W.2d at 611. The plaintiff carries the burden to prove the unlawful diversion caused damages to the plaintiff's property which would not have resulted but for such unlawful diversion. Benavides v. Gonzalez , 396 S.W.2d 512, 514 (Tex.App.-San Antonio 1965, no writ), citing Roby v. Hawthorne , 77 S.W.2d 923, 925 (Tex.Civ.App.-Dallas 1934, writ dism'd). The test for determining whether an alleged causative factor is a "but for" cause is whether the act or omission was a substantial factor in causing the damage, "without which the harm would not have occurred." Excel Corp. v. Apodaca , 81 S.W.3d 817, 820 (Tex. 2002), quoting Doe v. Boys Clubs of Greater Dallas, Inc. , 907 S.W.2d 472, 477 (Tex. 1995). The claims for violations of the Water Code are not dependent upon any finding as to Lakeside and Principal's negligence. Bily , 731 S.W.2d at 611.
Lakeside and Principal maintain that there is insufficient evidence to show that they permitted water to be diverted from the retaining wall down to the duplex property, causing the damage to the foundation. We disagree. While some of the testimony exhibited inconsistencies, *35 the record contains sufficient evidence to support a finding that Lakeside and Principal's failure to repair or maintain the retaining wall caused water to be unlawfully diverted onto the property, thereby damaging its foundation and surrounding areas. Lakeside and Principal, as the managing agent, were responsible with maintaining the common areas of the community. Both were aware that the retaining wall was failing. The 2005 Reserve Study recommended that the wall be replaced in 2006. Donald Scott, Lakeside's Capital Expenditures Chairman, testified that the function of the retaining wall was to retain dirt, resist force, and properly divert water that runs down the hill. Scott acknowledged that a failing retaining wall can redirect water to unintended areas. Ernest Hedgcoth testified extensively concerning the effect that the failing retaining wall would have on the property. According to Hedgcoth, had a proper concrete retaining wall been installed, water would have been allowed to seep out and not build up pressure against the wall or flow to the southeastern corner. The water traveling from the retaining wall caused significant lateral pressure to be placed on the foundation, eventually rotating the cripple wall underneath the house and separating stucco from the actual wall. As the failed retaining wall directed water onto the southeast corner of Belanger's property, it caused erosion.
The rotation of the cripple wall and cracking of the stucco occurred on the eastern side of the property, and mold was found on the southeastern side of Belanger's property. Several witnesses testified that the water coming from the retaining wall onto the southeastern corner of Belanger's property did not come from a capped water well, spring, the result of a sprinkler leak, or broken waterline. Robins opined that the gutters in place at Belanger's property were not the source of erosion.
Lakeside and Principal highlight a portion of Hedgcoth's testimony in which he purportedly admitted that he did not see any efforts to divert the natural occurring rainwater runoff. Lakeside's and Principal's expert engineer opined that there was nothing that could be done with this of retaining wall, or any type of retaining wall, that would have stopped the damage to the foundation because the foundation issues had to do with the way the duplex property was constructed, not the condition of the retaining wall. First, we address the legal sufficiency challenge. We find some evidence which tends to support the jury's verdict. While it is true that parts of the testimony from Hedgcoth and Woods is contradictory, it is within the province of the jury to resolve such conflicts. See City of Keller , 168 S.W.3d at 821. In a legal sufficiency review, we look to the evidence favorable to the jury's verdict and determine whether a rational juror could have reached that verdict. Based on the testimony of Scott, Belanger, Hedgcoth, and Robins, a rational juror could have concluded that Lakeside's and Principal's diversion of surface water from the retaining wall was a substantial factor in causing damage to the property.
Next, we address factual sufficiency. We conclude that the verdict is not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) ; America West Airlines, Inc. v. Tope , 935 S.W.2d 908, 912 (Tex.App.-El Paso 1996, writ dism'd). While there is no testimony that affirmatively states that Lakeside's and Principal's diversion of surface water was the only cause of damages, there is evidence to support the finding that their actions were a proximate cause of the damages. Under *36 Texas law, there can be more than one proximate cause. See Western Investments, Inc. v. Urena , 162 S.W.3d 547, 551 (Tex. 2005). We overrule the challenge to the water code violation.
TRESPASS
Lakeside and Principal also challenge the sufficiency of the evidence to support the jury's finding on trespass. A claim for trespass to real property requires a showing of an unauthorized physical entry onto the plaintiff's property by some person or thing. Ronald Holland's A-Plus Transmission & Auto., Inc. v. E-Z Mart Stores, Inc. , 184 S.W.3d 749, 758 (Tex.App.-San Antonio 2005, no pet.). "The entry need not be in person but may be made by causing or permitting a thing to cross the boundary of a property." Id. To recover damages for trespass to real property, a plaintiff must prove that (1) the plaintiff owns or has a lawful right to possess real property, (2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary, and (3) defendant's trespass caused injury to the plaintiff. Wilen v. Falkenstein , 191 S.W.3d 791, 798 (Tex.App.-Fort Worth 2006, pet. denied), citing generally Stone Res., Inc. v. Barnett , 661 S.W.2d 148, 151 (Tex.App.-Houston [1st Dist.] 1983, no writ).
Concerning the intent element of the tort, the only relevant intent is that of the actor to enter the property. Trinity Universal Ins. Co. v. Cowan , 945 S.W.2d 819, 827 (Tex. 1997) ; see also Malouf v. Dallas Athletic Country Club , 837 S.W.2d 674, 676 (Tex.App.-Dallas 1992, writ dism'd w.o.j.) (stating, "trespass is usually regarded as an intentional tort in the sense that it involves an intent to commit an act which violates a property right, or would be practically certain to have that effect, although the actor may not know that the act he intends to commit is such a violation").
The 2005 Reserve Study put Lakeside and Principal on notice of the retaining wall's deficiencies and its need to be repaired. The 2010 Reserve Study reemphasized the concerns related to retaining wall's condition. Slovak admitted at trial that sufficient funds existed to replace and/or repair the retaining wall from 2005 until 2013, when the wall was actually replaced. Robins discussed his evaluation of Lakeside's retaining walls and the drainage issues. He conducted his evaluation at Lakeside's request. He found that the retaining wall behind the duplex was in the worst condition in terms of dearth displacement, lateral and vertical loading, erosion, and dilapidation of the wall. Robins informed Lakeside of his findings. An engineering study performed at Robins' request showed that if the slope began to slide, the entire building, including the retaining wall, would collapse and overturn. To stabilize the slope behind the property, Robins recommended that a pier supported wall be installed, with piers placed every five feet. In making these recommendations, Robins was trying to implement a more permanent solution to direct the water coming from the retaining wall away from the duplex property. According to Robins, Appellants had already addressed similar drainage projects on other streets throughout the community. The evidence supports the jury's finding that Lakeside and Principal, in allowing or permitting the water to be directed to Belanger and Drennan's properties, caused extensive foundation damage to the properties.
Appellants rely on Cain v. Rust Indus. Cleaning Services, Inc. , 969 S.W.2d 464, 469 (Tex.App.-Texarkana 1998, pet. denied) for the proposition that it is the duty of the lower landowner-Belanger and *37 Drennan-to receive the natural flow of surface water. However, Belanger and Drennan correctly point out an important qualification to this rule: "The owner of a lower estate has the burden to receive waters flowing from the upper estate, so long as the water is flowing in its natural state, unhindered by the hands of man." Mitchell v. Blomdahl , 730 S.W.2d 791, 792 (Tex.App.-Austin 1987, writ ref'd n.r.e.) ; Bunch v. Thomas , 121 Tex. 225, 49 S.W.2d 421 (1932) ; Higgins v. Spear , 118 Tex. 310, 15 S.W.2d 1010 (1929). If the water does not reach the lower estate untouched and undirected by the hands of man, the water is no longer surface water. Mitchell , 730 S.W.2d at 792. While Appellants suggest that the surface water naturally drained down the hill onto the duplex properties, there is evidence to support the findings that the retaining wall and its improper drainage, under Lakeside's and Principal's control, caused the water to be directed onto the duplex property, damaging its foundation. We conclude that the evidence is sufficient to support the jury's finding that Lakeside HOA and Principal committed a trespass.
Appellants' final challenge to the trespass findings relate to the jury's mental anguish awards to Belanger and Drennan. The jury awarded $3,500 to Belanger and $1,500 to Drennan. Lakeside and Principal first maintain that the jury awarded mental anguish damages without first making a proper finding that a deliberate trespass and actual property damage occurred. Alternatively, they contend that the evidence is insufficient to support a finding that Belanger and Drennan suffered mental anguish. We agree.
Ordinarily, damages for mental suffering are not recoverable unless they result from or are accompanied by physical injury. Pargas of Longview, Inc. v. Jones , 573 S.W.2d 571, 572 (Tex.Civ.App.-Texarkana 1978, no pet.). But one exception to the rule is that actual damages resulting from mental distress may be recovered, as a separate and independent element, when caused by a deliberate and willful trespass in which actual damage to plaintiff's property is sustained. Michels v. Crouch , 122 S.W.2d 211 (Tex.Civ.App.-Eastland 1938, no writ.)
"[A]n award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." Parkway Co. v. Woodruff , 901 S.W.2d 434, 444 (Tex. 1995). When a claimant fails to present direct evidence of the nature, duration, or severity of mental anguish, we apply a traditional no evidence standard to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is more than mere worry, anxiety, vexation, embarrassment, or anger, to support any award of damages. Id.
Belanger testified that he purchased 3809 Mediterranean with the intention of using it as a rental property to provide him with income for his retirement. Since the issues with the property arose, the townhome was unsafe to rent and he had to come out of retirement and return to work because he could no longer afford both his own home and the rental property. Drennan testified that he lived in 3805 Mediterranean and it was his first home. When asked how all of the issues have affected him personally, emotionally, and physically, Drennan responded:
When I first bought the house, I was telling myself that this was going to be the house that I am staying in for a good portion of the foreseeable future. I really enjoy the area, and I thought I was *38 home. That was the place that I wanted to be and where I was going to be.
And, honestly, when all this started, it became just a source of aggravation at times when the biggest purchase of my life up to that day has things wrong with it. You know, I don't know if it's my fault or I don't know whose fault it is. To know that it is potentially getting worse, albeit slowly, but it's getting worse, it's hard to accept.
Drennan also received some money from a family member which was placed in a trust. He testified that he had to withdraw money from that trust to fix portions of his townhome, which led to withdrawal penalties.
This sparse evidence is woefully insufficient to support an award of mental anguish to both Belanger and Drennan. It does not amount to "a high degree of mental pain and distress" that is more than mere worry, anxiety, vexation, embarrassment, or anger. Woodruff , 901 S.W.2d at 444. We reverse and render on the issue of mental anguish.
NEGLIGENCE CLAIM
Belanger and Drennan also alleged that Lakeside and Principal were negligent, "by virtue of the common law and by virtue of their contractually undertaken duty to maintain and control the common areas, in maintaining and operating the common area in such a manner as to improperly divert surface and/or subsurface water onto or under the properties in question, or in allowing such to occur after being notified that such was occurring and posed an unreasonable risk of harm to [Belanger and Drennan's] properties, proximately causing damage to the properties in question." Question No. asked the jury if Lakeside's and Principal's negligence, if any, proximately caused damages to Belanger and Drennan's property, to which the jury responded "yes". Lakeside and Principal now claim on appeal that there is insufficient evidence to support such a finding.
The elements of negligence are the existence of a legal duty, breach of that duty, and damages proximately caused by the breach. Gharda USA, Inc. v. Control Solutions, Inc. , 464 S.W.3d 338, 352 (Tex. 2015) ; IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason , 143 S.W.3d 794, 798 (Tex. 2004) (citation omitted). The components of proximate cause are cause in fact and foreseeability. Doe v. Boys Clubs of Greater Dallas, Inc. , 907 S.W.2d 472, 478 (Tex. 1995) ; Travis v. City of Mesquite , 830 S.W.2d 94, 98 (Tex. 1992). These elements cannot be established by mere conjecture, guess, or speculation. McClure v. Allied Stores of Tex., Inc. , 608 S.W.2d 901, 903 (Tex. 1980) ; Farley v. MM Cattle Co. , 529 S.W.2d 751, 755 (Tex. 1975). The test for cause in fact is whether the negligent "act or omission was a substantial factor in bringing about injury," without which the harm would not have occurred. Prudential Ins. Co. of America v. Jefferson Assocs., Ltd. , 896 S.W.2d 156, 161 (Tex. 1995), citing McClure , 608 S.W.2d at 903 ; see Havner v. E-Z Mart Stores, Inc. , 825 S.W.2d 456, 458-59 (Tex. 1992) ; Brown v. Edwards Transfer Company, Inc. , 764 S.W.2d 220, 223 (Tex. 1988).
Just as the evidence was sufficient to uphold the jury's findings on the water code violation and trespass, it is also sufficient to find that Lakeside and Principal were negligent in failing to repair the retaining wall so as to allow water to be diverted onto the duplex property. We rely on substantially the same testimony and evidence as was used to support the water code violation and trespass finding and remain mindful that it is the province of jury to resolve conflicts in the evidence.
*39 Wheelbarger v. Landing Council of Co-Owners , 471 S.W.3d 875, 891 (Tex.App.-Houston [1st Dist.] 2015, pet. denied) ; City of Keller , 168 S.W.3d at 810. We provide here a summary of the evidence that would permit a reasonable juror to conclude that Lakeside and Principal were negligent.
Lakeside's responsibilities to maintain the common areas are discussed extensively above. Principal was the managing agent of Lakeside and owed various duties to maintain the common elements under the Managing Agreement. It was required to establish liaisons with contractors for corrective work at Lakeside's common areas. Principal was required to receive, record, and respond to service complaints made by the residents. It was also tasked with supervising and directing Lakeside's maintenance staff in accordance with a project plan prepared by Lakeside each week. One of Lakeside's Board presidents testified that Principal managed the property, including conducting general inspections and upkeep of the common areas.
In 2005, Lakeside conducted a Reserve Study which revealed that several retaining walls, including the one behind the duplex property, needed to be repaired. The Study recommended that the walls be replaced the next year. Despite learning that the retaining walls were failing and needed replacement, Lakeside did not replace the retaining walls until eight years later, in 2013. Slovak's testimony revealed that during the years between the reserve studies, the capital reserve budget contained sufficient funds to repair the retaining walls.
In 2009, Belanger began contacting Lakeside concerning the issues with his property and the surrounding common areas. Lakeside had the authority and staff to repair drainage issues on the slope behind the property. In fact, Lakeside's maintenance team was equipped to address drainage issues and repair concrete. Nonetheless, when Slovak asked Principal for advice concerning Belanger's complaints, Principal recommended that Lakeside contact an attorney.
In May 2011, Lakeside engaged Robins to assess the drainage and retaining wall issues. Robins designed a retaining wall which included a drainage system with piers to divert water from the house and to withstand the lateral forces of the hill. Lakeside obtained three bids, including Robins' bid, to repair the retaining wall in 2011, all of which were in the neighborhood of $50,000. Lakeside told Robins it wanted a less expensive option, which Robins declined. Lakeside never acted on any of the bids and ultimately repaired only 60% of the wall in 2013 for $27,000. According to Hedgcoth, the new concrete retaining wall still failed to properly provide adequate drainage. By continuing to allow deflection and rotation of the property, the cripple wall and supported floor would collapse. It was foreseeable to both defendants that damage would continue to occur, just as the reports of other engineers told them it would. Nonetheless, Lakeside and Principal continued to allow the condition of the retaining wall to remain, despite the risks and dangers it posed to the surrounding properties. See Sabine & E.T. Ry. Co. v. Joachimi , 58 Tex. 456, 459 (Tex. 1883).
Again Lakeside and Principal attempt to divert blame by focusing on faulty and defective construction. They consistently rely on the 1981 constructions plans found in Drennan's townhome as definitive evidence that had the duplex been built according to those plans, none of the damage would have ever occurred to the properties. These plans lack the proper architect and engineering certificates required to actually be utilized in construction. They were not filed with the County. There is no *40 evidence that these plans were intended to be used in constructing the duplex. Contrary to Appellants' position, Robins and Hedgcoth testified that the damage was a result of the failing retaining wall and not faulty construction. Because the record contains more than a scintilla of evidence to support the jury's finding on negligence, we overrule Lakeside and Principal's evidentiary challenge.
CLAIMS AGAINST PRINCIPAL
Lakeside and Principal appear to take issue with Questions 7 and 8, which mistakenly refer to Principal Management Group as "Property Management." Belanger and Drennan direct us to Barth v. Bank of America, N.A. , 351 S.W.3d 875, 876 (Tex. 2011), for the proposition that the jury charge's use of the term "Property Management" instead of "Principal Management" caused no harm. We find Barth persuasive.
Barth sued "Bank of America Corporation." Id. Bank of America, N.A., answered asserting that it had been incorrectly named as a party. Id. Even though the trial court granted Barth a trial amendment to correct the misnomer, the liability questions submitted to the jury and answered in Barth's favor nonetheless referred to Bank of America Corporation. Id. "Bank of America Corporation" was never mentioned in the evidence. Id. The trial court rendered judgment against Bank of America, N.A., but the Court of Appeals reversed and rendered, holding that the verdict did not support the judgment. Id. The Supreme Court reversed the Court of Appeals' decision, explaining:
A misnomer differs from a misidentification. Enserch Corp. v. Parker , 794 S.W.2d 2, 4 (Tex. 1990). Misidentification-the consequence of which are generally harsh-arises when two separate legal entities exist and a plaintiff mistakenly sues an entity with a name similar to that of the correct entity. Chilkewitz v. Hyson , 22 S.W.3d 825, 828 (Tex. 1999). A misnomer occurs when a party misnames itself or another party, but the correct parties are involved. Id. (noting that '[m]isnomer arises when a plaintiff sues the correct entity but misnames it'). Courts generally allow parties to correct a misnomer so long as it is not misleading.
The Supreme Court noted that "[n]othing in the record suggests that the jury could possibly have been confused, and its answers must be taken to be applicable to Bank of America, N.A." Id. at 877.
The same analysis applies here. There are only two defendants in this case. In the definition section of the charge, "Principal Management" is defined as: "Principal Management Group, a Texas Corporation, Principal Management Group of North Texas, and Principal Management Group, Inc." Despite this definition, Questions 7, 8, 9, and 10 nonetheless referred to Principal as "Property Management." It is undisputed that Principal was the only property management company involved in this lawsuit. The jury's answers should be applicable to Principal Management Group of North Texas as defined in the charge.
Lakeside and Principal next maintain that the evidence is insufficient to support Principal's liability as a managing agent of Lakeside. Belanger's and Drennan's initial response is that Lakeside and Principal have presented nothing for our review because they failed to adequately brief this argument. We agree.
An appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX.R.APP.P. 38.1(i) ; see also Hernandez v. Hernandez , 318 S.W.3d 464, 466-67 (Tex.App.-El Paso 2010, no pet.). To adequately *41 brief an issue, an appellant must discuss assertions of error and must present argument explaining why the law stated in the cited authorities is applicable to the facts of the case and why it supports the party's position. TEX.R.APP.P. 38.1(i) ; see also Hernandez , 318 S.W.3d at 466-67. An appellate court has "no duty-or even right-to perform an independent review of the record and applicable law to determine whether there was error." Hernandez , 318 S.W.3d at 466 ; see also Wheeler v. Methodist Hosp. , 95 S.W.3d 628, 646 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding issue inadequately briefed when party summarily stated his point of issue, without citations to legal authority or substantive analysis).
According to Appellants, "Principal, as the managing agent, was aware of what was happening at Lakeside Village with regard to projects, the need for improvements, and the prioritized schedule for replacing the retaining walls." They argue, however, that "mere awareness of information does not create authority to act" and "Lakeside HOA did not delegate to Principal the task of evaluating, hiring, or otherwise making decisions regarding any capital improvements." Based on the lack of briefing, it is unclear what evidence or law Principal believes supports this assertion. Where, as here, an appellate issue is asserted generally, but not supported by argument or citation to the record or legal authority, nothing is presented for review. Rodriguez v. JPMorgan Chase Bank, N.A. , No. 04-14-00342-CV, 2015 WL 3772110, at *2 (Tex.App.-San Antonio Jun. 17, 2015, pet. denied) (mem. op.).
Despite the failure to properly brief this issue, we note that James Heck, a director for Principal, testified that Principal has a responsibility to maintain Lakeside's common elements. The Managing Agreement provided that everything done by the managing agent was performed as an agent of Lakeside. Principal conducted physical inspections of Lakeside for approximately one hour per day, maintained the common elements, and prepared the annual budget.
When questioned about Lakeside budget, Elder, Principal's on-site manager, confirmed that in 2005, after the Reserve Study was conducted, the budget contained $195,560. In 2010, $179,000 available in the reserve fund for projects. In 2011, Lakeside increased their reserve fund by $100,000. There is also evidence Principal addressed flooding issues on other properties as well as initiating repairs to alter a drainage system away from another property. And Lakeside, via email from Slovak to Principal's Elder and Heck, asked for guidance, writing:
Mr. Belanger has been asking the board, single board members, Maintenance personnel, Maintenance Board Liaison, and past presidents to fix his foundation and drive for several years [before I was president].
* * * *
[Lakeside HOA] recognizes that the retaining wall is deteriorating and needs to be repaired, but it is about 10 years old, and it is time to get rid of the railroad ties.
Heck testified that he did not investigate the property prior to responding to this email and did not check the budget to confirm whether funds were available to make repairs. Principal's response to the Board was as follows:
It sounds like the Board has been addressing the complaint as funds are available and any subsequent actions that may be necessary. The engineer's report should clarify the HOA's position as well. You may want to put your attorney on notice regarding the matter to be on the safe side.
*42 From this, a jury could reasonably conclude that Principal was liable in failing to maintain the common areas.
DAMAGES
Appellants make several challenges to the jury's award of damages to Belanger and Drennan. First, they maintain that the evidence is insufficient to support the verdict. We adopt the legal sufficiency standard of review discussed above.
Plaintiffs have the burden to prove their damages with a reasonable degree of certainty. U.S. Renal Care, Inc. v. Jaafar , 345 S.W.3d 600, 613 (Tex.App.-San Antonio 2011, pet. denied) ; A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc. , 798 S.W.2d 606, 615 (Tex.App.-Dallas 1990, writ denied). Although damages must be established with reasonable certainty, they need not be established with mathematical precision. O and B Farms, Inc. v. Black , 300 S.W.3d 418, 422 (Tex.App.-Houston [14th Dist.] 2009, pet. denied), citing Qaddura v. Indo-European Foods, Inc. , 141 S.W.3d 882, 890 (Tex.App.-Dallas 2004, pet. denied). Furthermore, to recover damages for the costs of repairs to property, a plaintiff must show that the cost of repairs was reasonable and necessary. 2 Fat Guys Investment, Inc. v. Klaver , 928 S.W.2d 268, 273 (Tex.App.-San Antonio 1996, no writ) ; Merchants Fast Motor Lines, Inc. v. State , 917 S.W.2d 518, 523 (Tex.App.-Waco 1996, writ denied). To establish that repairs are reasonable and necessary, it is not imperative that the terms "reasonable" and "necessary" be used. Klaver , 928 S.W.2d at 273. Instead, a damaged party is only required to present evidence of damages sufficient and competent enough to justify the fact finder's conclusion that costs are in fact reasonable and necessary. Id. The jury awarded Belanger: (1) $65,000 for repairs; (2) $3,200 for the repair of the AC unit; (3) $6,900 for mold remediation; (4) $25,200 for lost rentals in the past; (5) $12,600 for loss of rental income in the future; and (6) $3,500 for mental anguish in the past. The jury awarded Drennan: (1) $37,000 for repairs; and (2) $1,500 for mental anguish in the past.
Concerning the cost of repairs to the duplex foundation, Hedgcoth's testimony as well as other evidence presented showed that the damage to the property occurred because of the failing retaining wall behind the property. The water coming through the retaining wall and fill space caused erosion; this erosion along with the lateral forces from the retaining wall placed significant pressure against the duplex's foundation and cripple wall, causing it to rotate and separate. Robins similarly testified that the drainage issues caused by the failing retaining wall compromised the duplex's foundation.
According to Hedgcoth, this damage could have been prevented with the placement of a swale or flume to keep the water away from the foundation. Hedgcoth also opined that it would have been unreasonable for Belanger and Drennan to repair the damage to the foundation prior to making the necessary repairs to the retaining wall, because the retaining wall, until fixed, would continue to damage the foundation of the duplex. Additionally, the repairs to townhomes will require bracing and wall stabilization before the foundation can repaired, as well as installing piers. Costs of repairs for this type of work at 3805 Mediterranean were estimated at $43,000 and $65,000 for 3809 Mediterranean.[3] The evidence therefore supported a *43 finding that damages existed. De Los Santos v. Alamo Lumber Co. , 683 S.W.2d 48, 52-53 (Tex.App.-San Antonio 1984, no writ).
Moving on to the damages awarded for the repair costs to Belanger's AC unit, the expert testimony showed that erosion from the rainwater flowing through the fill space and retaining wall caused Belanger's AC to slide down the hill. John Moses, who conducted an inspection of the property and worked on Lakeside's front gate project, also testified that placing plastic on top of the fill space would direct water to the southeastern corner of Belanger's property, which is where the AC unit was located. Robins also testified that the gutters in place at Belanger's property were not the source of erosion.
We next address the jury's award to Belanger for loss of rentals. Loss of rentals is an appropriate measure of damages for the temporary loss of use of land. TheSabine & E.T. Ry. Co. v. Joachimi , 58 Tex. 456 (Tex. 1883) ; Bradley v. McIntyre , 373 S.W.2d 389 (Tex.Civ.App.-Houston 1963, writ ref'd n.r.e.). Recovery for loss of use is limited to the time reasonably required to repair the property. Goose Creek Consol. Independent School Dist. of Chambers and Harris Counties, Texas v. Jarrar's Plumbing, Inc. , 74 S.W.3d 486, 496 (Tex.App.-Texarkana 2002, pet. denied). However, the plaintiff's inability to have the property fixed for financial or other reasons will be taken into account when determining such reasonableness. Mondragon v. Austin , 954 S.W.2d 191, 194 (Tex.App.-Austin 1997, pet. denied).
Additionally, the plaintiff may only recover for such loss of use if the reasonable value of the use can be established with fair certainty. Goose Creek , 74 S.W.3d at 496 ; Davis v. Mrs. Baird's Bakery , 30 S.W.2d 809, 810 (Tex.Civ.App.-Fort Worth 1930, no writ). Absolute certainty is not required, as latitude is allowed in determining damages where there is no precise measurement. Goose Creek , 74 S.W.3d at 496-97. The usual measure of damages for loss of use of injured property is the reasonable cost of renting a replacement, although the plaintiff need not actually rent a substitute or show any amounts actually expended during the period of loss in order to recovery. Elias v. Mr. Yamaha, Inc. , 33 S.W.3d 54, 61 (Tex.App.-El Paso 2000, no pet.) ; Luna v. N. Star Dodge Sales, Inc. , 667 S.W.2d 115, 119 (Tex. 1984). When property is not rentable, the plaintiff may resort to proving the actual worth of use. Goose Creek , 74 S.W.3d at 497.
Here, Belanger testified that he rented the property at 3809 Mediterranean for $1,050-$1,300 per month. He testified that he lowered the rent for two reasons: the possibility of foundation damage and a change in the economy. His tenant, Jean Koch, testified that she rented the unit for $1,050 per month, plus utilities. At the time of trial, the property had been vacant for at least 20 months and was not rentable due to safety concerns. This resulted in a loss of rental income in the amount of approximately $21,000 if he rented the townhome out for $1,050 per month to $26,000 if he rented it for $1,300 per month.
Moreover, necessary foundation repairs still required approval from Lakeside's architectural review committee, which is the controlling entity for exterior modifications, infrastructure, and new construction at Lakeside Village. Once the repairs are approved, Belanger testified that he thought it would take an additional three to four months to complete the repairs. We conclude that the evidence is sufficient to *44 support the jury's award of loss of rentals. Goose Creek , 74 S.W.3d at 496-97.
Appellants make some reference to Belanger's failure to replace an exhaust fan in the crawlspace as well as his failure to repair the French drain. They fail to explain the significance of this information is or how it relates to their argument.
Finally, concerning the jury's award for mold remediation, the 2003 inspection of Belanger's townhome revealed no indication of mold. In 2012, however, Nathan Schukei, who conducts mold inspections, discovered areas of mold growth and water intrusion in Belanger's crawl space, primarily on the south and east walls. David Ondieki, who also inspected Belanger's townhome for mold, provided a written estimate for the mold remediation at $5,249.34. In addition to the remediation costs, a certified mold remediation plan and a licensed consultant were required to oversee the project, which would cost and additional $1,000-$1,200. Again, we find that there was sufficient evidence in the record support's the jury's award to Belanger for mold remediation.
Appellants next argue that the damages awarded to Belanger and Drennan were excessive. While Appellants cite some relevant law in this section, they provide no citation to the record. Similarly lacking is any type of analysis or application of the law they cited to the facts of this case. Again we find that Appellants have failed to adequately brief this section of their argument as required by Rule 38.1(i) of the Texas Rules of Appellate Procedure. See TEX.R.APP.P. 38.1(i) ; Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc. , 106 S.W.3d 118, 128 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (a party's brief "must contain a succinct, clear, and accurate statement of the argument made in the body of the brief" and Rule 38.1(i) requires the parties to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue); see also Franklin v. Enserch, Inc. , 961 S.W.2d 704, 711 (Tex.App.-Amarillo, 1998, no pet.). This is not done by merely uttering brief conclusory statements, without citation to the record or any application of the cited law to the facts. Id.
In the interest of justice, however, we will attempt to address Appellants' concerns that the damages were excessive. The burden of establishing that the jury's evaluation of damages is erroneous is upon the appellant. City of Austin v. Selter , 415 S.W.2d 489, 502 (Tex.Civ.App.-Austin 1967, writ ref'd n.r.e.). In determining whether a verdict is "excessive" the courts must review only the evidence favorable to the award, and the findings of the jury thereon will not be disturbed on grounds of "excessiveness" if there is any evidence to sustain the award. Hammond v. Stricklen , 498 S.W.2d 356 (Tex.Civ.App.-Tyler 1973, writ ref'd n.r.e.). T.J. Allen Distributing Co. v. Leatherwood , 648 S.W.2d 773, 775 (Tex.App.-Beaumont 1983, writ ref'd n.r.e.). Hammond states the rules applicable to "excessive" verdicts:
[The courts] will not merely interfere and substitute their judgments, nor is it material that the courts might have awarded a lesser sum as fact finders; there must be some circumstantial indication of bias or prejudice; ... and in the absence of an affirmative showing of bias or prejudice the court of civil appeals will give every intendment to the evidence supporting the verdict.
Hammond , 498 S.W.2d at 363. Contrary to the case cited by Appellants, Saenz v. Fidelity & Guaranty Insurance Underwriters , 925 S.W.2d 607, 614 (Tex. 1996), the jury's awards were not "picked out of the *45 air." We have carefully reviewed the record as to Belanger's and Drennan's damages, and discussed the evidence extensively above. Moreover, Belanger and Drennan voluntarily offered a remitter of $28,000 and $16,000, respectively. Applying the applicable standard of review, we cannot conclude that the damages are excessive.
Lakeside and Principal relatedly argue that Belanger and Drennan's damages exceeded the statutory cap of $100,000 as set forth in Section 84.006 of the Texas Civil Practice and Remedies Code. However, their argument consists of one citation for the proposition that Section 84.006 includes pre-judgment interest, Military Highway Water Supply Corp. v. Morin , 114 S.W.3d 728, 739 (Tex.App.-Corpus Christi 2003, no pet.), coupled with the conclusory statement that the total amount awarded to Belanger and Drennan against Lakeside cannot exceed $100,000 and the final judgment in this case did. We agree with Appellees that Appellants waived this issue on appeal due to improper briefing. TEX.R.APP.P. 38.1(i). Without more, we are unsure of the argument being advanced by Appellants.
Next, Appellants contend that the trial court erred in submitting the damages questions to the jury in a broad form submission format. Belanger and Drennan respond again that Lakeside and Principal failed to preserve this issue for our review because they did not object to the form of the question during the charge conference. Rather, Appellants objected to the evidence supporting costs of repairs, and raised several no-evidence objections to the loss of rental income as well as to the submission of a question on mental anguish. We agree with Appellees.
Our procedural rules state that any complaint to a jury charge is waived unless specifically included in an objection. TEX.R.CIV.P. 274 ; TEX.R.APP.P. 33.1(a)(1). A party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling. State Dept. of Highways & Public Transportation v. Payne , 838 S.W.2d 235, 241 (Tex. 1992). The Texas Supreme Court has emphasized that complaints of error in broad-form submission must be preserved by objection at trial. See Harris County v. Smith , 96 S.W.3d 230, 236 (Tex. 2002) ("A timely objection, plainly informing the court that a specific element of damages should not be included in a broad-form question because there is no evidence to support its submission, therefore preserves the error for appellate review."); Crown Life Ins. Co. v. Casteel , 22 S.W.3d 378, 389 (Tex. 2000) (holding it is harmful error when a broad-form question erroneously commingles valid and invalid theories and an objection is "timely and specific").
When a single broad-form liability question commingles valid and invalid liability grounds and the appellant's objection is timely and specific, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an invalid theory. Harris County v. Smith , 96 S.W.3d 230, 232 (Tex. 2002) ; see also Crown Life Ins. Co. v. Casteel , 22 S.W.3d 378, 388-89 (Tex. 2000). Here, Appellants did not object to the form of submission. There merely objected to the evidence supporting costs of repairs, loss of rental income, and submission of a mental anguish question in a property case. Even had Appellants properly objected, their argument is still without merit as the evidence supports the validity of Appellees' multiple theories of liability.[4]
*46 Next Appellants argue that attorneys' fees were not segregated between the tort and contract causes of action. Attorneys' fees are awarded for breach of contract claims, but are not recoverable in tort actions. Huddleston v. Pace , 790 S.W.2d 47, 49 (Tex.App.-San Antonio 1990, writ denied). It is incumbent upon the party seeking to recover attorneys' fees to offer evidence of fees associated with the causes of action for which attorneys' fees may be recoverable. See Stewart Title Guaranty Co. v. Sterling , 822 S.W.2d 1, 10-11 (Tex. 1991). If any attorneys' fees relate to a claim for which such fees are not recoverable, a claimant must segregate recoverable from unrecoverable fees. Tony Gullo Motors I, LP v. Chapa , 212 S.W.3d 299, 313 (Tex. 2006). An award of attorneys' fees erroneously based upon evidence of unsegregated fees requires a remand. Sterling , 822 S.W.2d at 11, citing International Security Life Ins. Co. v. Finck , 496 S.W.2d 544, 546 (Tex. 1973).
While Appellants correctly cite to the applicable law in this instance, Appellees respond that they waived this argument by failing to object to the failure to segregate at trial or by a post-verdict motion. We agree. To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX.R.APP.P. 33.1(a)(1)(A). In the context of segregation of fees, the party opposing an award of attorney's fees must make a timely objection. Morales v. Rice , 388 S.W.3d 376, 384 (Tex.App.-El Paso 2012, no pet.). If no one objects that the attorney's fees are not segregated as to specific claims, then the objection is waived. Id. Appellants waived review of this complaint because they failed to raise it in the trial court. All of Appellants' arguments relating to damages are overruled.
CUMULATIVE ERROR
Appellants finally maintain that the cumulative effect of errors in this case deprived them of their right to a fair trial and due process under the law. When several errors exist but are not considered reversible, all errors considered together could present cumulative error requiring reversal. Fibreboard Corp. v. Pool , 813 S.W.2d 658, 695-96 (Tex.App.-Texarkana, writ denied) ; Klein v. Sporting Goods, Inc. , 772 S.W.2d 173, 179 (Tex.App.-Houston [14th Dist.] 1989, writ denied). To determine if a cumulation of errors denied Appellants their right to a fair trial and due process of law, all errors in the case *47 will be considered along with the record as a whole to determine if the errors collectively were calculated to cause and probably did cause the rendition of an improper judgment.
Pool , 813 S.W.2d at 695-96. Other than the jury's mental anguish award to Belanger and Drennan, we have found no error. Accordingly, we find no cumulative error. Appellants' final point of error is overruled.
CONCLUSION
Because there is insufficient evidence to support the jury's award of mental anguish to both Belanger and Drennan, we reverse and render on this issue only. We affirm the remainder of the judgment in all other respects.
Hughes, J., not participating

By the terms of these documents, maintenance and repair of the common areas are within the exclusive province of Lakeside and Principal. The dues themselves impose a requirement on Lakeside to maintain the property for recreation, health, safety, and welfare of its residents. The fees charged to each owner is an assessment by the terms of the Declaration, and the amounts of the fees are set by the Board of Directors based on cash requirements necessary to provide for the payment of estimated expenses growing out of or connected with the maintenance and operation of the common elements. If an owner does not pay the monthly fees, Lakeside can file a lien for the charges. It controls all operations, payment of costs of maintenance and repair to the common elements, and all other expenses and liabilities incurred by the association. Appellants have no control over the extent of repairs and maintenance of the common elements individually. Riddick v. Quail Harbor Condominium Ass'n, Inc. , 7 S.W.3d 663, 669-70 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

To prevail on a breach of contract claim, a party must show the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant, and damages resulting from the breach. Kay v. N. Tex. Rod & Custom , 109 S.W.3d 924, 927 (Tex.App.-Dallas 2003, no pet.).

Belanger and Drennan voluntarily remitted suns of $28,000 and $16,000, respectively, to account for the repairs to the common areas.

Appellants cite to Casteel , 22 S.W.3d at 388-89, to support their proposition that the trial court committed reversible error in submitting the damages question in a broad form submission format. However, the Casteel analysis is not relevant to the issues before us today. The Supreme Court in Casteel addressed a situation where, in the face of a timely and specific objection, a trial court submitted a single broad-form liability question incorporating multiple theories of liability, some valid and some not. Id. at 388. It explained that when a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories of liability, the appellate court is often unable to determine the effect of this error. Id. The best the court can do is determine that some evidence could have supported the jury's conclusion on a legally valid theory. Id. The Casteel court concluded that this error cannot be harmless inasmuch as it would allow a defendant to be held liable without the judicial determination that a fact finder actually found that the defendant should be held on proper, legal grounds. Id. Because we made the determination in the sections discussing liability above, that Appellees' several liability theories were valid, the broad form submission question did not commingle valid theories with invalid theories of liability. Accordingly, there is no Casteel issue to address.